FULTON ET AL., APPELLEES AND CROSS-APPELLANTS, *v.* ASZMAN ET AL., APPELLANTS AND CROSS-APPELLEES.

(Nos. 418, 419, 424 and 427— Decided March 31, 1982.)

*Mr. Arthur C. Church,* for appellees and cross-appellants Fulton.

*Mr. Mark Clark,* for appellants and cross-appellees Aszman.

*Mr. John B. Anderson,* for appellant and cross-appellee Harold W. Hague Co.

ZIEGEL, J. In December 1974, plaintiffs, having just moved to the Cincinnati area from Michigan, sought a five-to-seven acre tract of real estate upon which to build a home. In their search they were represented by realtor, Connie Charles, who located a parcel in which plaintiffs were interested upon which was a sign indicating that the property was being sold through the appellant, the Harold W. Hague Company (hereinafter "Hague"), with the agent in charge being the appellant, Shirley Aszman, who was working with her husband, Sandy Aszman (hereinafter "Aszman"). Plaintiffs were interested in the first parcel "next to the creek." The transaction was eventually completed, and plaintiffs received a deed and gave a mortgage as a part of their financing. A short time later plaintiffs had their contractor begin grading for their driveway and excavating for their basement, at which time they were advised that the work in progress was not being conducted on the land which they had purchased. The land described in their deed placed the creek essentially in the center of their property, not on the edge of it. On May 12, 1975, they brought action for damages against Aszman, Hague and others alleging that they had misrepresented the location of the real estate purchased. After one trial for which a motion for new trial was granted, the proceedings upon which this appeal is based were tried by a jury on February 4 and 5, 1980, with a verdict being rendered for plaintiffs against both Aszman and Hague for $15,000. The trial court reduced that verdict to $12,500 to conform to plaintiffs' demand for relief. Thereafter each of the above-named parties filed appropriate notices of appeal.

The Aszman brief sets forth four assignments of error, and the Hague brief asserts six assignments of error. By way of cross-appeal, plaintiffs have asserted two assignments of error. The Aszman-Hague assignments of error will be discussed first. Facts pertinent to each assignment of error will be set forth in the discussion.

## I

In the Aszman assignment of error three and the Hague assignment of error four, each contend that the trial court erred in permitting Connie Charles over objection to testify by way of an expert opinion as to the value of the property, each claiming that she was not qualified as an expert. As of the date she testified, Charles was a sales manager for Showcase Realtors, her employer, and she had been a licensed realtor and had been actively selling real estate since January 1974. While each of these appellants argue that such testimony is insufficient to qualify her as an expert witness for the purpose of testifying as to the value of

real estate, it is interesting to note that Hague's own counsel called upon her for a valuation estimate.

Generally, the ruling of a trial judge as to the qualifications of an expert witness is within the judge's sound discretion, which is conclusive unless it is clearly shown to be erroneous. 21 Ohio Jurisprudence 2d 431, Evidence, Section 422. Since the evidence did establish that Connie Charles had been in the business of selling real estate for more than six years at the time she testified, the trial judge had a sound basis for considering her to be qualified to give testimony as to real estate values. That the evidence did not show such things as how many times she had appraised property, etc., goes to the weight of her testimony, not to its admissibility. These assignments of error are held not to be well taken.

## II

At the first trial of this case, one Robert White testified for Aszman and Hague. Since that time, he had retired from his position with the Warren County Health Department and was living in Florida. A transcript of testimony in the first case was proffered and refused. The trial court's refusal to accept such evidence is assigned as error number two by Aszman and number one by Hague.

Aszman contends that R.C. 2317.06 allows earlier testimony of a witness beyond the court's jurisdiction to be taken into evidence. That section, as effective on May 23, 1980, the date of trial, provided in pertinent part:

"When a party or witness, after testifying orally, * * * is beyond the jurisdiction of the court, * * * if the evidence given by such * * * witness is incorporated into a bill of exceptions * * * and such bill has been signed by the judge or court before whom such evidence was given, the evidence so incorporated into such bill of exceptions may be read in evidence by either party on the further trial of the case. If no bill of exceptions has been taken or signed, but the evidence of such party or witness has been taken down by an official stenographer, the evidence so taken may be read in evidence by either party on the further trial of the case and shall be prima facie evidence of what such *deceased party or witness* testified to orally on the former trial. * * *'' (Emphasis added.)

Obviously, the first sentence of the code section above quoted does not apply. There was no appeal from the first trial, the new trial having been granted pursuant to motion in the trial court, and therefore, there could have been no "bill of exceptions." As we read the second sentence of that quoted section, where no bill of exceptions has been taken or signed, on a further trial the testimony of a *deceased party or witness* may be read into evidence. The evidence did not establish that Robert White was deceased. Thus, the trial court did not err in refusing to permit White's testimony given at the first trial to be read into evidence.

We observe that subsequent to the date of the trial now being appealed, on May 28, 1981, R.C. 2317.06 was amended so that now the testimony of a witness, given at a former trial, who is at the time of the present trial beyond the jurisdiction of the court, may be read into evidence, no mention being made of death of the witness. Likewise, we note that Evid. R. 804(B)(1), which became effective on July 1, 1980, also subsequent to the date of the trial in question, now permits such testimony to be read into the record.

We also observe, from our reading of the transcript of Mr. White's testimony in the first trial which was attached to the Aszman brief, that the substance of White's proffered testimony was included in the testimony of Larry Wiser, an active employee of the health department, and the testimony of Paul Buker, Superintendent of the Warren County Building and Zoning Inspection Department. Thus, even if the trial judge erred in refusing to permit White's testimony taken at the

first trial to be read into evidence, that error would not have been prejudicial. Accordingly, we hold that Aszman's second assignment of error and Hague's first assignment of error are not well taken.

### III

For its fourth assignment of error, Hague contends that the trial court erred in not permitting counsel to call the defendant, Shirley Aszman, as if on cross-examination, in its case-in-chief. Hague bases its claim of error on R.C. 2317.07, which provides, *inter alia,* that, "[A]t the instance of the adverse party, a party may be examined as if under cross-examination * * *." Both Hague and Shirley Aszman were co-defendants. Neither of them, however, filed any cross-complaint against the other. Hague contends that they were nevertheless adverse since it was to Shirley Aszman's best interest to have Hague found liable so that there would be several liabilities.

Hague has not cited any cases in support of its contention, and our own research has not uncovered anything appropriate. Insofar as the pleadings are concerned, no issues are set forth in which Hague is adverse to Shirley Aszman. To hold as Hague urges would be to declare that in any case brought against alleged joint tortfeasors, that alone would make the alleged tortfeasors adverse to each other, even though their primary interest in preventing the plaintiff from recovering was cooperative. Nothing in the pleadings before us indicates that either of these alleged joint tortfeasors was attempting to steer sole liability to the other. In our opinion, their interests were not adverse, and therefore, the trial judge did not err when he refused to permit one of them to call the other as on cross-examination. This assignment of error is accordingly overruled.

### IV

At the close of plaintiffs' case, and again at the close of all of the evidence, both Hague and Aszman moved for directed verdicts. The overruling of these motions is charged as error in the second assignment of error in the briefs of each of these parties. Each of them contends that there was no showing of fraudulent conduct on the part of either of them.

It is undisputed that in December 1974, plaintiffs were looking either for a newly built home on a five-acre tract of land, more or less, or vacant acreage of similar size upon which they might build a home. With the assistance of Connie Charles, a real estate agent, they did locate a suitable vacant tract, which was a part of some two hundred acres owned by one Nicholas M. Gormas, and which was in the process of being sold for him by appellant Hague, whose agent in charge was appellant Shirley Aszman. It was established that Shirley worked on this project in conjunction with her husband, appellant Sandy Aszman; Gormas was willing to sell either the entire two hundred acres or to sell lesser amounts. At the time plaintiffs contacted Aszman, through Charles, none of the Gormas acreage had been sold, and the tract involved in this law suit was indeed the first tract to be sold.

The property in question was located on the Roachester-Cozaddale Road, Warren County, a road which runs generally in a southwest-northeast direction. After clearing the question of availability with Shirley Aszman, on December 31 Connie Charles drafted an offer to purchase for plaintiffs' signatures. That offer described the property desired as "6.30 acres southeast side of Roachester-Cozaddale Road. First parcel northeast of the creek." After some dickering over price, the offer was accepted, and a closing date was set for February 10, 1975. For reasons attributable to the seller, closing did not take place on that date, and thereafter, on March 13, 1975, a new offer to purchase was made. Although this offer was prepared in Charles' office, its text was apparently given to her secretary over the telephone by Aszman. This

second contract simply said "6.2 acres," without reference to any location. Robert Fulton admitted that he read this contract before he signed it.

At no time in advance of the closing was any specific description given for the land to be conveyed. Likewise, at no time did plaintiff or Charles ever mention any land except that which began northeast of the creek. It was always plaintiff's intention that the land he was buying should have the creek on its southwest side. Some one hundred and fifty to two hundred feet southwest of the creek was a cemetery, and at no time was the cemetery ever mentioned as being one of the boundaries of the land in question. Although some rough sketches were exchanged, no survey of the land was ever shown to plaintiff prior to closing. He did ask for the survey at the time of the closing, but, although the survey had been made sometime before and had been in Aszman's hands, for some unknown reason it was not available for plaintiff's inspection at that time.

As indicated in the first part of this opinion, after plaintiff accepted the deed and executed the mortgage to secure payment for the land, plaintiff learned that the southwest boundary of the land he had purchased was not the creek, but was the cemetery, and that instead of the creek being on the southwest side of the land, it was essentially in the middle. Aszman admitted in his testimony that he had received and read the contract dated December 31, 1974. He insisted, however, that as far as he was concerned, he was always talking of a tract which began at the cemetery. After plaintiff discovered what he had received, he got in touch with Charles, who then consulted with one Donald G. Attermeyer, broker-owner of the real estate agency with whom she was associated. Attermeyer was of the opinion that plaintiff had received the wrong deed, and he telephoned Aszman about getting a corrected one. He also offered to swap lots, or to make arrangements so plaintiff could buy two lots, both of which suggestions Aszman rejected. According to Attermeyer, Sandy Aszman replied: "No, the man got the right lot. He got the lot that I wanted to deed him." And, "the fool bought what he bought." Sandy Aszman did not deny this report of his conversation.

Both the deed which plaintiff accepted, and the mortgage which he executed, as a part of the description of the land being conveyed, contained the following: "764.89 feet to an iron pin at the easterly corner of a cemetery tract," and "Thence, with the northeasterly line of the cemetery tract, North 32 degrees, 12 minutes, 46 seconds West (passing an iron pin at 305.00 feet) a distance of 330 feet to the point of beginning * * *." Plaintiff admitted that at the closing he did not read either the description contained in the deed or that contained in the mortgage. At least to one with some experience in reading non-platted land descriptions, it is apparent that the land being purchased abutted on the cemetery tract.

Both Aszman and Hague argue that since the deed and mortgage description clearly indicated the cemetery as a boundary, and since by inspection plaintiffs could have discovered this fact, he is not now in a position to claim that anything was misrepresented to him, citing *Traverse* v. *Long* (1956), 165 Ohio St. 249 [59 O.O. 325]; and *Ralston* v. *Grinder* (1966), 8 Ohio App. 2d 208 [37 O.O.2d 213].

*Traverse, supra,* involved a controversy over some filled land on a portion of property which the plaintiff was purchasing. It appears that the real estate agent made some false statements to plaintiffs relative to the condition of this filled land, but it also appears that the misstatements were not willfully false, but were based on his honest opinion. The Supreme Court's opinion contains no syllabus, but does contain the following statement:

"The principle of *caveat emptor* applies to sales of real estate relative to con-

ditions open to observation. Where those conditions are discoverable and the purchaser has the opportunity for investigation and determination without concealment or hindrance by the vendor, the purchaser has no just cause for complaint even though there are misstatements and misrepresentations by the vendor not so reprehensible in nature as to constitute fraud." *Id.* at 252.

That statement itself indicates that the results might have been different if the misstatements and misrepresentations had been so reprehensible in nature as to constitute fraud. There the court decided that question as a matter of fact. The factual matter is not so clear here, as to whether Aszman, knowing that plaintiffs wanted the land they were purchasing to run northeastwardly from the creek, deliberately prepared a deed which began at the cemetery tract, under circumstances which might constitute fraud. A jury question thus remained.

*Ralston, supra,* involved a situation in which the real estate agents had advised plaintiffs-purchasers that there were three acres of land in the tract to be sold. The owner told them the same thing. Prior to the recording of the deed, plaintiffs had executed a mortgage which contained a description of the land purchased as containing 1.4874 acres. The court held there that plaintiffs could not, because of their failure to investigate, complain of fraud when the land area, by the execution of the mortgage, was brought to their attention, and they cannot be heard to deny that their own negligence created the situation about which they now complain. In the case *sub judice,* it is submitted that even though *Ralston* dealt with quantity the same rule should apply as to location particularly where a deed and mortgage review at closing would have given obvious notice that the tract being purchased began at the cemetery line, not at the creek.

There were, however, other factors which may have influenced the *Ralston* court in its conclusion. In addition to the notice given by the quantity designation of 1.4874 acres contained in the mortgage, plaintiffs in that case were also physically shown the precise land they were buying before any mortgage was executed or deed accepted. They had inspected the property several times and the boundaries were pointed out. They easily could have checked the distances and computed the area. These factors were not present in the case before us.

Ohio case law has not covered the situation of an alleged misrepresentation as to location of land. Our own research has developed that the matter has received attention in other jurisdictions. In 37 American Jurisprudence 2d Fraud and Deceit, Section 98, it is stated at pages 141-142, that "[T]he general principle is well settled that false statements or misrepresentations as to the location, boundaries, or identity of real property which is the subject of a transaction constitute actionable fraud and will sustain an action of deceit or constitute ground for rescinding the contract. * * *" Likewise, in 37 Corpus Juris Secundum, Fraud, Section 52, it is stated that "[M]isrepresentation as to the boundaries or location of real property constitute fraud where the other essential elements of fraud are present; even where the facts are matters of public record the representee is not required to conduct a search, and may have redress for misrepresentations." Again, in 91 Corpus Juris Secundum 925, Vendor & Purchaser, Section 64(b), the following appears:

"The seller's misrepresentation as to the position of the boundary lines of the property may invalidate the sale where the falsely asserted boundaries form part of the inducement to buy and constitute a material factor in the sale, as where land which would have formed part of the parcel conveyed, had the representations been true, is not included in the boundaries of the land actually sold and the part

thus lost is a material part of the whole tract in quantity or value. * * *"

Cited in support of the last part above quoted is *Williams* v. *Reinert* (1933), 251 Ky. 344, 65 S.W.2d 66, a case in which, as here, the buyer accepted a deed without seeing or reading the description.

That the deed which plaintiffs accepted and the mortgage which they executed contained a description which, if read, clearly indicated that the land they were buying began at the cemetery line rather than at the creek as they intended is thus not conclusive of the absence of misrepresentations by Aszman. Motions for directed verdicts are construed most strongly against the moving party. If there are undecided factual questions upon which reasonable minds might differ, the motion to direct must be overruled, and the matter submitted to the jury under proper instructions.' Our review of the record causes us to conclude that such is the case here.

The Aszman motion for a directed verdict made at the close of plaintiffs' case was in two parts: first, a general verdict, and secondly, a directed verdict as to plaintiffs' demand for punitive damages. The trial court granted the motion insofar as the demand for punitive damages was concerned. In connection with their second assignment of error, Aszman contends that the claim for punitive damages encompasses the same elements necessary to entitle plaintiffs to receive compensatory damages, and that therefore when the demand for punitive damages was dismissed, the demand for compensatory damages should also have been dismissed.

The case of *Logsdon* v. *Graham Ford Co.* (1978), 54 Ohio St. 2d 336 [8 O.O.3d 349], belies this contention, with the Supreme Court holding that there was a distinction between the kind of fraud necessary to be shown to establish a right to compensatory damages, and the kind necessary to be shown to justify punitive damages. In the latter case, the fraud must be gross or malicious. The effect of the trial court's holding in the case before us is that that court found that there was sufficient evidence presented by plaintiffs to require jury consideration of the issue of ordinary fraud, but no evidence to support a finding of gross or malicious fraud. Whether the trial court was correct from a factual point of view in making that distinction will be discussed later in this opinion as we deal with plaintiffs' cross-appeal assignments of error. Insofar as this assignment of error is concerned, we hold that the trial court had a legal right to make such a distinction.

Hague's liability in this case had to rest on respondeat superior, the agency relationship between it and Aszman. In its second assignment of error (its motion for directed verdict), it contended that the motion should have been granted since there was no showing of Aszman's agency or the scope of that agency, but rather there was a showing that Aszman was an independent contractor. Hague pointed out that Aszman was employed to accomplish some result or some piece of work, and was at liberty in general to choose his own means and methods, being responsible only for the results. *Post Publishing Co.* v. *Schickling* (1926), 22 Ohio App. 318. Primary reliance is placed on *Councell* v. *Douglas* (1955), 163 Ohio St. 292 [56 O.O. 262], paragraph one of the syllabus, wherein it is stated that "[T]he relationship of principal and agent or master and servant is distinguished from the relationship of employer and independent contractor by the following test: Did the employer retain control of, or the right to control the mode and manner of doing the work contracted for?" Our attention is also invited to several other cases supporting this point of view, none of which, however, involves the relationship of real estate broker and salesman.

Plaintiffs do not cite any cases but do factually point out that Hague always retained the right to fire Aszman, and that

after the problem of the location of the land became apparent, Aszman did consult with Hague about it.

In their briefs, counsel for both parties discuss this issue on a common-law basis. Neither of them make any reference to R.C. Chapter 4735 on real estate brokers. R.C. 4735.01(A) defines a "real estate broker" and establishes the areas in which such broker may perform. R.C. 4735.01(C) provides that:

" 'Real estate salesman' means any person associated with a licensed real estate broker to do or to deal in any acts or transactions set out or comprehended by the definition of a real estate broker as set forth in this section, for compensation or otherwise."

R.C. 4735.07 prescribes for the licensing of real estate brokers, and sets forth in detail the preliminary education and practical experience which a person must have before being examined and qualified as a real estate broker. R.C. 4735.09 prescribes for the licensing of real estate salesmen, and an examination of these two sections clearly reveals that a much more comprehensive background and a much more detailed examination is required for licensing a real estate broker. The second paragraph of R.C. 4735.21 is also instructive:

"No real estate salesman shall collect any money in connection with any real estate brokerage transaction, whether as a commission, deposit, payment, rental, or otherwise, except in the name of and with the consent of the licensed real estate broker under whom he is licensed. Nor shall any real estate salesman commence or maintain any action for a commission or other compensation in connection with a real estate brokerage transaction, against any person except a person licensed as a real estate broker under whom he is licensed as a salesman at the time the cause of action arose."

In *Wolf* v. *Hyman* (1957), 104 Ohio App. 32 [4 O.O.2d 75], the Hamilton County Court of Appeals commented on R.C. Chapter 4735, as follows:

"It will be observed that a real estate salesman is given no right to conclude a sale. He is an associate of a licensed real estate broker who, by definition, is the one who sells. It will also be observed that a licensed real estate salesman has no independent status. He is an associate of a licensed real estate broker, and can only function through the broker with whom he is associated * * *." *Id.* at 35.

Here, both Sandy Aszman and Shirley Aszman were simply real estate salesmen; they were not real estate brokers. Thus, under the statute, they could have no independent status, regardless of how loose the arrangements might have been between them, or either of them, and Hague. Such a construction of the statute is consistent with the public policy behind its enactment. Being subject to less stringent qualifications, the real estate salesman is required to be under the supervision of a licensed real estate broker in all of his activities relative to the sale of real property. If the Hague contention were approved, the only purpose of the statute would be to enable the real estate broker to share in the commission created by the real estate salesman — certainly an absurd purpose. Statutorily, then, Hague cannot deny the Aszman agency.

The trial court did not err in overruling the respective motions for directed verdicts, and therefore, the second assignment of error of each appellant is held not to be well taken.

V

Both Aszman and Hague contend that portions of the trial court's charge to the jury were prejudicially erroneous, such contentions being Aszman assignment of error one and Hague assignment of error five. Aszman claims that "[I]n an action for fraudulent misrepresentation it was error for the trial court to fail to give an instruction that the alleged wrongdoers

must be proved to have had the intent to deceive in order to be liable." Hague states the same alleged error a different way: "Absent fraud on the part of a seller of real property or his agents, there can be no recovery by a buyer based upon a theory of either negligent or tortious misrepresentation."

The charge to the jury complained of was given as follows:

"The first thing the Plaintiffs have to prove then by a preponderance of the evidence is that one or the other of the Aszmans made representations to Mr. Fulton that he was being sold a lot other than the one he actually received. So, that is the beginning. They have to prove that there was a misrepresentation. Then it must also be shown that the misrepresentation was known by the Aszmans to be false — that is, that the Aszmans, one or the other of them, knew better. Then, it must be proved that the Plaintiffs relied on that untrue representation and were deceived by it * * *."

It is clear that at no place in the above-quoted jury charge was there any reference to any requirement that the jury find that Aszman intended to deceive plaintiffs. The charge does, however, require the jury to find that Aszman knew the representations to be false, and that plaintiffs relied on them.

In their brief, Aszman relied on 24 Ohio Jurisprudence 2d 703, Fraud and Deceit, Section 109:

"The rule is firmly established that the existence of a fraudulent intent or intent to deceive is an indispensable element to successful maintenance of a tort action of deceit for the recovery of damages. Actual fraud is the foundation, or, as is often said, the gist or gravamen of the action of deceit. It must be shown that the representation was made with the fraudulent intent of deceiving and inducing persons to act upon it, in order to constitute an action of deceit for fraudulent misrepresentation, or to

defeat a recovery on the fraudulent contract."

So far as it goes, the above quotation correctly states the law. It is not, however, complete. Section 113, at 706, *op. cit.,* provides:

"The intention to deceive may be inferred, and, in some cases, will be conclusively imputed upon the principle that a party must be presumed to intend the necessary consequences of his own acts or conduct. Intent need not be proved where the facts show that the party making the fraudulent representations must have known their falsity and intended them to be an inducement to the transaction."

Again, in Section 114, at pages 706-707, it is stated that "[W]here knowledge of the falsity of representations is shown, it is not essential that there be a motive for actual fraud."

The charge of the trial court in the case at bar required the jury to find that (1) the representations made by Aszman were false; (2) that Aszman knew they were false; and (3) that plaintiffs relied on such representations. If the jury found affirmatively on these issues, Aszman's intent to deceive would be inferred, and accordingly we conclude that no specific charge on intent to deceive was necessary. *Gleason* v. *Bell* (1915), 91 Ohio St. 268; *Mohler* v. *Baker* (1950), 88 Ohio App. 461 [45 O.O. 238].

As indicated *supra* in this opinion, between the time plaintiffs accepted the deed to the property and the time they learned that they had not received the property for which allegedly they had bargained, their builder, Mr. Hogue, had begun work on a driveway and on the proposed basement for their home which was not located on the property which had been deeded to them. In this connection, Fulton testified as follows:

"Q. What work had he done?

"A. Well, he had excavated the driveway and excavated the basement and began [*sic*] work on the foundation.

"Q. And did you agree to pay Mr. Hogue for this?

"A. Oh, yes.

"Q. How much did you agree to pay him?

"A. $2,500.00 for that work.

"Q. Okay, now, this was part of the contract that he had with Mr. Hogue?

"A. That was part of the price that was included in the house, yes."

In connection with this evidence, the trial court charged the jury as follows:

"Now, if you find in favor of the plaintiffs, you may award to the plaintiffs whatever sum of money you find from the evidence is reasonably necessary to compensate them for their loss in regard to this particular matter of the driveway and the other excavation. You should look at the particular expense that was incurred here for this driveway and so much of it as you find was actually and reasonably incurred by the plaintiffs."

At the conclusion of the charge, Hague objected "to the damage instruction as it relates specifically to the $2,500 charge for the driveway." It now asserts error as follows:

"Where the plaintiff's testimony indicates that he had agreed to pay a third party $2500.00 for certain work done, but that he had not paid that sum and did not present testimony as to the reasonable value of this amount, then it cannot be considered by the jury as an element of damages."

In support, Hague cites *Motorist Mutual* v. *Cook* (1971), 31 Ohio App. 2d 1 [60 O.O.2d 25], and *Hellkamp* v. *Boiman* (1970), 25 Ohio App. 2d 117 [54 O.O.2d 237]. Neither of these cases, however, dealt with a contractual obligation. If plaintiffs agreed to pay Mr. Hogue $2,500 for the driveway and basement and he in fact did that work, plaintiffs are obligated to pay him that much for the work done, regardless of what the reasonable value of that work might have been. Thus, we conclude that the trial court did not err in giving the above-quoted charge.

Finally, Hague contends that the trial court erred in refusing to give the instruction suggested by its counsel, that "an independent contractor, just as an agent, can be fired and discharged from employment; that this act of firing and discharging does not in itself have any bearing as to whether someone is an agent or an independent contractor." Earlier in this opinion, we determined that under R.C. Chapter 4735, Aszman as real estate sales persons could have no status independent of their real estate broker, Hague. Since they could not be independent contractors, but were limited to an agency relationship in whatever type of an arrangement they had with Hague, it was not error for the trial court to refuse to give any charge relative to the distinction between an independent contractor and an agent. We observe that had the verdict of the jury been in favor of Hague, plaintiffs, had they objected appropriately at the close of the charge, would have had just complaint as to the entire portion of the charge dealing with independent contractors.

Accordingly, we conclude that none of the appellants' assignments of error relative to the charge of the trial court to the jury is well taken.

## VI

For its final assignment of error, Hague asserts that the verdict of the jury is against the manifest weight of the evidence. The basis for this assertion is the contention that the evidence established that plaintiffs were themselves guilty of something similar to contributory negligence, in that it was error to conclude that they were acting with ordinary common prudence in this transaction. The trial court did give the jury an instruction on this issue. Hague argues that the evidence showed conclusively that Fulton did not act as a prudent person should, and that he had ample opportunity to protect his own interest but chose not to do so. In support, it cites *Oakes* v. *Aller* (1964), 7 Ohio App. 2d 72 [36 O.O.2d 159],

wherein the following quotation from 37 Corpus Juris Secundum 284, Fraud, Section 37, is approved:

"One cannot secure redress for fraud where he acted on his own judgment derived from independent investigation or reports or advice and not on the representations made to him; the representee is ordinarily chargeable with knowledge of all the facts which his investigation should disclose."

The above quotation is, of course, inapposite. Plaintiffs did not make any investigation of their own. They relied upon the impression they received from Aszman. In this connection, we note that "[A] false representation may be made by conduct calculated and intended to produce a false impression as well as by words." 24 Ohio Jurisprudence 2d 638, Fraud and Deceit, Section 25. Were they justified in relying on Aszman?

Hindsight being better than foresight, it is obvious that there were a number of things plaintiffs could have done to protect themselves from what happened. It cannot be said as a matter of law, however, that a purchaser of real estate is not entitled to rely on representations made by one selling, or responsible for selling, that real estate. See 24 Ohio Jurisprudence 2d 722, Fraud and Deceit, Section 130. Whether plaintiffs exercised prudence in their reliance on Aszman was a fact question for the jury, was indeed submitted to that body, the trial court charging the jury that "it must be proved that in relying on that representation, they were acting with ordinary prudence, that is, the prudence that an ordinary person would use under circumstances of this type considering the nature of the transaction." No objections were made as to that charge.

From our review of the transcript of the testimony, it does appear that the verdict was supported by some credible evidence going to all the essential elements of the case. Under such circumstances, a reviewing court cannot find that the result was against the manifest weight of the evidence. *C. E. Morris Co.* v. *Foley Construction Co.* (1978), 54 Ohio St. 2d 279 [8 O.O.3d 261]. Hague's sixth assignment of error is accordingly held not to be well taken.

### A

Plaintiffs have also filed a cross-appeal, with their first assignment of error on cross-appeal being that the trial court erred in not submitting to the jury the claim of the plaintiffs for punitive damages. The issue of punitive damages was discussed earlier in this opinion in connection with the Aszman second assignment of error regarding the overruling of their motion for a directed verdict. Per *Logsdon* v. *Graham Ford, supra,* we recognized that fraud may be simple, or it may be gross and malicious, the latter being required before punitive damages may be assessed. Mr. Aszman did indeed make some statements to Connie Charles to the effect that he hated Fulton, and he did refer to him as a "son of a bitch." These statements, however, were made after plaintiffs learned they had not been deeded the land they intended to purchase, and were attempting to have the matter remedied in their favor. There was no evidence to show that at the time Aszman was actually in the act of making what the jury found to be misrepresentation he bore any ill will toward plaintiffs. Accordingly, we conclude that the trial court did not err when it refused to submit the question of punitive damages to the jury.

### B

Plaintiffs' second assignment of error by way of cross-appeal is that the trial court erred in not permitting the plaintiffs to amend their complaint seven days prior to trial.

As indicated in the first part of this opinion, this appeal is taken from the second trial of this case. The first trial took place in May 1978, and resulted in a verdict for plaintiffs in the amount of

$15,000. Plaintiffs' complaint was filed on May 12, 1975, and sought compensatory damages of $12,500. Within seven days of the second trial date, February 4, 1980, plaintiffs amended their demand to $25,000 and thereafter the trial court sustained Hague's motion to strike this amended demand, which order gave rise to this assignment of error.

Plaintiffs rely on Civ. R. 54(C) which provides in pertinent part:

"* * * [A] demand for judgment which seeks a judgment for money shall limit the claimant to the sum claimed in the demand unless he amends his demand not later than seven days before the commencement of the trial. Additional service of process is not necessary upon such amendment."

Both appellants contend that such an increase in the demand is nevertheless an amendment to the complaint which is governed by Civ. R. 15(A), which provides in pertinent part:

"A party may amend his pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, he may so amend it at any time within twenty-eight days after it is served. Otherwise a party may amend his pleading only by leave of court or by written consent of the adverse party. Leave of court shall be freely given when justice so requires. * * *"

Appellants point out that neither of them has consented to the amendment.

It is clear that both Civ. R. 15(A) and 54(C) deal with amendments to pleadings. It is also readily apparent that they are from the point of view of dealing with the same subject matter inconsistent, in that the Civ. R. 15(A) provides that unless the amendment is made before a responsive pleading is served or within twenty-eight days after a pleading to which no responsive pleading is permitted, it must have court approval or other party consent to

be effective, while, on the other hand Civ. R. 54(C) permits its kinds of amendment not later than seven days before trial and makes no requirement for either court approval or other party consent. The inconsistency is resolvable, however, when it is considered that Civ. R. 15(A) deals with amendments generally, while Civ. R. 54(C) is applicable only to amendments of the money demand for relief.

We hold, therefore, that Civ. R. 54(C), applying only to amendments of the demand is an exception to the court approval or party consent provisions of Civ. R. 15(A). Since Civ. R. 54(C) makes no provision either for court approval or party consent, as long as the amendment is made not later than seven days before trial, the demand as such may be amended, *pro forma,* and neither court consent nor opposing party approval is a prerequisite to its effectiveness.

Appellants argue that such a holding would put them at a disadvantage in obtaining discovery prior to trial to determine the reason for the increased demand. If that were the case, a motion for continuance would be in order.

Cross-appellants' second assignment of error is accordingly sustained.

The judgment of the Court of Common Pleas of Warren County, will therefore be affirmed in part and reversed in part. Since the reversal is based on the trial court's sustaining of Hague's motion to strike plaintiffs' amended demand, pursuant to authority conferred upon us by App. R. 12(B), having determined that the trial court committed error prejudicial to the cross-appellants, we now conclude that plaintiffs-cross-appellants are entitled to have judgment rendered in their favor in the amount of $15,000, that amount being the verdict of the jury without the trial court's reduction. It is our holding that since the trial court should have permitted the amended demand of $25,000 to stand, there was no basis for reducing the jury's verdict to

$12,500, the amount demanded in the original complaint.

*Judgment affirmed in part and reversed in part.*

HENDRICKSON, P.J., and KOEHLER, J., concur.

ZIEGEL, J., retired, of the Court of Common Pleas of Preble County, was assigned to active duty under authority of Section 6(C), Article IV, Constitution.