DAVIS et al., Appellees and Cross–Appellants,

v.

SUN REFINING AND MARKETING COMPANY, Appellant and Cross–Appellee.

[Cite as *Davis v. Sun Refining & Marketing Co.* (1996), 109 Ohio App.3d 42.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 15219.

Decided Jan. 31, 1996.

**46**

*A. Mark Segreti, Jr.,* for plaintiffs-appellees and cross-appellants.

*David S. Hoffman* and *Michael R. Blumenthal,* for defendant-appellant and cross-appellee.

BROGAN, Presiding Judge.

·Appellant Sun Refining and Marketing Co. ("Sun") appeals from the judgment of the Montgomery County Court of Common Pleas finding it liable for breach of contract and fraudulent concealment, ordering it to pay $24,515.23 in compensatory damages to appellees Donald P. Davis and Maxine Davis, and granting the Davises' demand for specific performance of the contract to remedy the gasoline contamination of a certain parcel of property. Sun also appeals from the trial court's award of costs and attorney fees to the Davises as punitive damages.

This case centers around a parcel of property located at 4400 Brandt Pike in Dayton, Ohio. In 1985, the Davises purchased the parcel of property from Sun for $85,000, and operated an automotive transmission repair service at that location from 1986 until 1989. Prior to the sale, Sun used the property for operation of a Sunoco gasoline station for approximately twenty years. During that time, gasoline was stored beneath the property in four six-thousand-gallon underground storage tanks.

The property contains above-ground pump islands that were formerly used to dispense gasoline. To reach the pump islands, gasoline was pumped through underground piping that connected the underground tanks to the pump islands. Prior to the sale of the property to the Davises, Sun informed them that the tanks had to be removed because they were more than twenty years old. Sun subsequently removed them from the property, but did not remove the connecting piping. After removing the tanks, Sun covered the excavation areas with dirt. Although Davis inspected the property after Sun removed the tanks, he did not discover that the piping had not been removed. Gasoline remained in the piping and was eventually released into the surrounding soil.

In June 1989, the Davises entered into a contract to sell the property to United Dairy Farmers ("UDF"). Pursuant to the terms of the contract, UDF agreed to purchase the property for $275,000, subject to certain environmental contingencies. An addendum to the contract provided that UDF had the right to terminate the contract if testing revealed that the property was environmentally unsuitable.

After signing the contract, UDF hired the H.C. Nutting Company ("Nutting") to conduct an initial environmental site assessment of the property. Nutting drilled five soil borings in various locations on the property to determine if the soil was contaminated. Laboratory analysis of borings located in the north pump island area, the former tank pit area, and the former south pump island area. revealed high levels of benzene, toluene, ethyl benzene, xylenes, and other petroleum hydrocarbons. The petroleum hydrocarbon levels detected exceeded the state's guidelines.

The Davises and Sun were informed of the testing results. Thereafter, Robert Berger, the Davises' attorney, contacted UDF and Sun concerning the results. From subsequent conversations with Sun, Berger understood that Sun would assume responsibility for the cleanup of the contamination. That understanding was further evidenced by a letter from Sun to Berger which stated that Sun would assume responsibility for removal of the contaminated soil in accordance with the environmental report. In exchange, Davis granted Sun permission to enter the property to proceed with the cleanup, and Sun agreed not to hold Davis liable for any injuries or claims associated with its activity on the property. UDF agreed to extend the closing date of the contract to allow time for completion of the cleanup.

Sun thereafter hired Westinghouse Environmental and Geotechnical Services, Inc. ("Westinghouse") to perform the environmental cleanup of the property, which began in February 1990. Westinghouse was told by a representative of Sun to remedy only the contamination in the tank pit area, and not to perform any cleanup in the other two contaminated areas. In accordance with Sun's instructions, the work performed by Westinghouse was limited to excavating the former tank pit area, replacing the contaminated soil with clean fill, and repaving the surface with asphalt.

After Westinghouse completed its work, Nutting returned to the property at UDF's request to confirm the cleanup of the property. Nutting's inspection confirmed that cleanup work had been done in the tank pit area, but not in the areas that had caused the most concern during the initial site assessment. Nutting recommended that the piping be removed and that further contamination testing be conducted. Further testing revealed that significant contamination of both the soil and groundwater remained. Thereafter, Nutting submitted a final report to UDF, which concluded that "significant subsurface contamination is present between the two former pump island locations, north of the north pump island, and on the east side of the former UST [underground storage tank] pit," as well as additional groundwater contamination in the area of the south pump island. Nutting recommended several alternative methods of cleanup ranging in cost from $120,000 to $250,000. A more precise estimate could not be calculated without the preparation of a corrective action plan at an additional cost of $15,000 to $20,000. Based on the report, UDF terminated the contract to purchase the property from the Davises.

The Davises spent $24,515.23 attempting to remedy the contamination of the north pump island location, including removing the piping and substantial amounts of contaminated soil. However, the Davises were unable to complete the cleanup because of the excessive expense.

On May 9, 1991, the Davises filed a complaint alleging violations of state and federal law concerning the removal of the tanks, and seeking recovery for the cost of the cleanup. By way of two amended complaints, the Davises revised their allegations, eliminating their previous claims for violations of state and federal law, and instead alleging nuisance, breach of contract, and fraudulent concealment. As amended, their demand for relief included a request for specific performance of the contract to remedy the contamination.

Sun subsequently filed a motion for partial summary judgment on the grounds that the alleged contract to remedy the contamination was not supported by consideration, and that the Davises did not have standing to bring a claim for nuisance. On December 11, 1992, the trial court issued a decision and entry granting summary judgment in favor of Sun on the nuisance claim, and overruling the motion on the breach of contract claim. In its decision, the court found that a contract was formed between the parties by way of the letter from Sun assuming responsibility for the cleanup of the contaminated soil; the court further found that the contract was supported by consideration due to the Davises' promise to allow Sun to have access to the property for the cleanup.

The case proceeded to trial before a referee on the breach of contract and fraudulent concealment claims on September 13, 14, and 15, 1993. At trial, the Davises presented the testimony of several witnesses, including witnesses from Nutting and Westinghouse, and two environmental experts. The experts testified that the contamination of the property was due to the underground tanks and piping, and that none of the contamination resulted from the Davises' use of the property as a transmission service. Sun did not present any evidence at trial.

On December 13, 1993, the referee filed her report, recommending that the Davises be awarded $24,515.23 in damages for breach of the contract to remedy the contamination of the property, and that an order of specific performance be granted requiring Sun to perform the cleanup. The referee also recommended that Sun be found liable for fraudulently concealing the fact that the piping had not been removed, and pay punitive damages equal to the Davises' litigation expenses and attorney fees associated with the action. Both parties filed timely objections to the referee's report. On March 28, 1995, the trial court issued a decision and entry adopting the referee's report and recommendations. The court's order required Sun to post a $400,000 bond to ensure the cleanup of the property, to perform the cleanup within one year, and to obtain certification from the state fire marshal's office that the cleanup complied with state guidelines.

Sun proceeded to file this appeal. The Davises have cross-appealed from the same judgment.

■ Sun asserts five assignments of error. As its first assignment of error, Sun raises the following:

"I. The court's order of specific performance exceeds its authority because the regulation of underground storage tanks, including assessment and cleanup, is within the exclusive jurisdiction of the state fire marshal."

In support of this assignment of error, Sun argues that the trial court erred in granting specific performance requiring it to clean up the contamination because Ohio statutory law grants exclusive authority to the state fire marshal to regulate the remediation of petroleum contamination caused by underground storage tanks. Sun further contends that the court's order requiring it to post a bond to ensure the cleanup and to complete the remediation within one year exceeds the court's judicial authority and interferes with the powers of the fire marshal. In essence, Sun argues that the trial court's remedy of specific performance conflicts with the statutory authority of the fire marshal.

Ohio's underground storage tank law is set forth at R.C. 3737.88 *et seq.* These provisions confer upon the fire marshal the responsibility for "implementation of the underground storage tank program and corrective action program for releases from underground petroleum storage tanks." R.C. 3737.88(A)(1). To accomplish this, the fire marshal is authorized to "adopt, amend, and rescind such rules, conduct such inspections, require annual registration of underground storage tanks, issue such citations and orders to enforce those rules, and perform such other duties, as are consistent with those programs." R.C. 3737.88(A)(1). The fire marshal is also authorized to adopt rules which establish standards for corrective actions for suspected and confirmed releases of petroleum. R.C. 3737.882(B). In accordance with these provisions, the fire marshal has adopted rules and regulations with respect to underground storage tanks. See Ohio Adm.Code 1301:7-9-01 to 1301:7-9-15. Ohio Adm.Code 1301:7-9-13 sets forth specific steps that must be followed by an owner or operator in undertaking corrective action in response to contamination resulting from underground storage tank systems.

Sun first argues that the trial court's order of specific performance of the contract to clean up the contamination of the property unduly interferes with the authority of the fire marshal, as granted by the legislature, to regulate corrective actions to remedy contamination caused by USTs. Therefore, Sun contends that the court's order was a usurpation of legislative power.

■ We agree with Sun that, in fashioning remedies in areas that are subject to administrative regulation, courts must be careful not to exercise their jurisdiction in a manner which either interferes with the General Assembly's authority to pass administrative statutes or usurps the authority of administrative bodies to

promulgate rules and regulations pursuant to those statutes. See *Wagner v. Cleveland* (1988), 62 Ohio App.3d 8, 14, 574 N.E.2d 533, 537. However, in this case, we find that the trial court's award of specific performance does not unduly interfere with the authority of the fire marshal to regulate the cleanup of petroleum contamination. The court's order was stated in general terms; it does not require that certain methods or techniques must be utilized in the cleanup, nor does it specify a chronology of steps to be undertaken during the process.

 Sun next contends that the trial court's specific requirements that it post a $400,000 bond and perform the cleanup within one year conflict with standards set forth by the fire marshal. As to the requirement that Sun post a bond, we find no conflict with the fire marshal's authority; we have found no rules or regulations promulgated by the fire marshal that are in any way affected by the bond requirement. However, as to the requirement that Sun complete the cleanup within one year, we find the argument persuasive. From our review of the regulations contained in the Ohio Administrative Code concerning the remediation of petroleum contamination, it is at least plausible that Sun's completion of the task in accordance with the requirements set forth by the fire marshal could take more than one year. Therefore, it appears to us that the trial court's requirement that the cleanup be completed within one year potentially conflicts with the regulations adopted by the fire marshal.

Accordingly, the trial court's order is modified to the limited extent that the requirement that the cleanup be completed within one year is eliminated. Instead, Sun is ordered to complete the cleanup in an expedited manner, in full accordance with all requirements and regulations promulgated by the fire marshal.

The assignment of error is sustained in part.

"II. Davis has no authority to maintain a private cause of action for cleanup of a UST petroleum release because only the fire marshal can maintain such an action."

 In support of this assignment of error, Sun argues that Ohio's underground storage tank law, R.C. 3737.88 *et seq.*, does not authorize a private cause of action for its enforcement. Rather, Sun contends, only the state fire marshal may initiate an action under that law to enforce the cleanup of petroleum contamination caused by underground storage tanks. Thus, Sun claims that the Davises have no authority to maintain such a private cause of action, and the trial court erred in allowing the action to proceed to conclusion.

Sun cites *Lyden Co. v. Citgo Petroleum Corp.* (N.D.Ohio 1991), No. 1:91CV1967, unreported, 1991 WL 325786, as the sole authority in support of this argument. In *Lyden,* the plaintiff brought an action against a petroleum

company seeking reimbursement of expenses incurred for cleaning up gasoline contamination of two parcels of property previously owned by the defendants. The plaintiff alleged eleven causes of action against the defendants, including violation of Ohio's underground storage tank laws, fraudulent concealment, breach of implied warranties, and nuisance. In granting the defendants' motion to dismiss the claims involving violations of Ohio's underground storage tank laws, the court stated as follows:

"Lyden's third cause of action alleges that [the defendants] are liable to Lyden under O.R.C. § 3737.87 *et seq.*, Ohio's underground storage tank law. [The defendants], however, argue that unlike CERCLA, this Ohio statute does not allow a private individual to bring a cause of action. Rather the statute provides that '[i]f, after an examination or inspection, the fire marshal or an assistant fire marshal finds that a release of petroleum [from an underground storage tank] is suspected, he shall take such action as he considers necessary * * *.' O.R.C. 3737.882(A). The statute goes on to say that the person responsible for the release of petroleum 'is strictly liable to the State for any costs incurred for any corrective or enforcement action undertaken by the fire marshal * * *. The attorney general, upon request of the fire marshal, shall bring a civil action to recover those costs * * *.' *Id.* at § 3737.89. These provisions make it clear that in Ohio, a fire marshal is the only person entitled to initiate an action and recover costs under this statute." (Emphasis omitted.) *Id.* at 8–9.

Sun claims that the federal district court's holding in *Lyden* that only the fire marshal may bring an action to enforce Ohio's underground storage tank law is dispositive of the Davises' claims in this case.

Although we agree with the court's reasoning in *Lyden,* we do not find the court's holding in that case to be applicable here. In the case before us, in contrast to the situation present in *Lyden,* the Davises have not alleged a cause of action based on violation of Ohio's underground storage tank law. Rather, the Davises' claims are limited to the common-law actions of breach of contract and fraudulent concealment. In *Lyden,* the plaintiff's common-law actions of fraudulent concealment, breach of implied warranties, and nondisclosure were not dismissed, but, rather, were apparently allowed to proceed. *Id.* Thus, we do not find Sun's argument based on *Lyden* persuasive.

Furthermore, there is nothing in Ohio's underground storage tank law that precludes private parties from pursuing common-law remedies in connection with environmental contamination. See *Helmick v. Cincinnati Word Processing, Inc.* (1989), 45 Ohio St.3d 131, 135, 543 N.E.2d 1212, 1216.

The assignment of error is overruled.

■ As its third assignment of error, Sun raises the following:

"III. The referee and the lower court erred in admitting the hearsay statements of an unidentified person offered against defendant Sun."

In support of this assignment of error, Sun contends that the trial court committed prejudicial error by admitting into evidence certain hearsay statements made by an unidentified declarant. Specifically, Sun challenges the admissibility of Davis's testimony concerning statements made to him by a representative of Sun regarding the removal of the tanks prior to the sale of the property. Sun claims that the testimony should not have been admitted because Davis could not specifically identify, by name, the particular representative who made the statements. Sun further argues that this testimony formed part of the basis for the trial court's finding of fraudulent concealment, and, thus, its erroneous admission was unduly prejudicial to Sun.

The trial court has broad discretion in determining the admissibility of evidence at trial. A trial court's determination that evidence will be admitted or excluded will not be reversed on appeal absent a demonstration of an abuse of that discretion. *O'Brien v. Angley* (1980), 63 Ohio St.2d 159, 163, 17 O.O.3d 98, 100, 407 N.E.2d 490, 493–494. Abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 482, 450 N.E.2d 1140, 1142.

Pursuant to Evid.R. 801(D)(2), statements or admissions against interest made by a party-opponent are not hearsay and are, therefore, not subject to exclusion under Evid.R. 802. The rule further provides that statements made by an agent or employee, during the existence of the relationship, concerning a matter within the scope of the agency or employment, are considered admissions by a party-opponent. Evid.R. 801(D)(2)(d). Although Sun recognizes this general rule, it contends that statements made by an unidentified declarant are considered hearsay and, as such, are inadmissible.

In support of its argument, Sun cites *Shaffer v. S.S. Kresge Co.* (App.1937), 24 Ohio Law Abs. 9. In *Shaffer,* the court held that the testimony of a witness concerning statements made to her by "a little short man wearing glasses" that she had seen "previously on the second floor cleaning" constituted inadmissible hearsay because the individual was not identified as an employee of the defendant. *Id.* at 10, 12. The *Shaffer* court did not hold, as Sun contends, that a hearsay declarant must be identified specifically by name, nor have we found any other case law to support that contention. Rather, the pivotal inquiry for admission of a statement under Evid.R. 801(D)(2)(d) is whether the statement was made by an agent or employee of the party-opponent, during the existence of the relationship, concerning a matter within the scope of the employment or agency.

During trial, Davis testified as follows regarding the identity of the Sun representative who made the statements to him concerning the USTs:

"Q. Okay. Who did—who did you deal with at Sun with regard to the purchase of the property and discuss about the underground storage tanks?

"A. Joseph Palmrick [phonetic].

" * * *

"Q. What did the Sun representative tell you about the underground storage tanks?

"MR. SMITH: Objection. Are you talking now about Joseph Palmrick, Mr. Segreti?

"MR. SEGRETI: Whoever he talked to about the underground storage tanks.

"THE WITNESS: I probably need to clarify. Joseph Palmrick put me in contact with the Real Estate Department of Sunoco, Sun Oil Company. Whoever was in that office at that time was the one that I dealt with back and forth to make an offer on the property, which they rejected. And they resubmitted another one, I accepted."

Davis further testified that his contact with the representative was by telephone, and was conducted through Sun's Philadelphia office.

Although the foundation testimony is admittedly not overwhelming, we cannot find that the trial court abused its discretion in admitting Davis's subsequent testimony concerning the statements made to him by the representative. Unlike the situation in *Shaffer*, Davis plainly identified the declarant as an employee of Sun to whom he was referred by another Sun employee, Joseph Palmrick. Davis further identified the office and department in which the representative was employed. Finally, it is clear that statements made by a real estate representative concerning conditions of the property, *i.e.*, the removal of underground tanks, are within the scope of his employment. The trial court acted within its discretion in determining that the requirements of Evid.R. 801(D)(2)(d) were met.

The assignment of error is overruled.

As its fourth assignment of error, Sun raises the following:

"IV. The court's finding of fraud by Sun against Davis is not supported by a preponderance of the evidence and is unreasonable and unlawful."

The thrust of Sun's argument in support of this assignment of error is that the trial court's finding that Sun fraudulently concealed the fact that the piping was not removed prior to the sale of the property to the Davises is against the manifest weight of the evidence.

On appeal, a trial court's judgment will not be reversed as being against the manifest weight of the evidence if it is supported by some competent, credible evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus. "If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 411, 461 N.E.2d 1273, 1276, fn. 3, quoting 5 Ohio Jurisprudence 3d (1978) 191–192, Appellate Review, Section 603.

In order to prove fraud, the plaintiff must prove the following elements:

"(a) a representation or, where there is a duty to disclose, concealment of a fact, (b) which is material to the transaction at hand, (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance." *Gaines v. Preterm–Cleveland, Inc.* (1987), 33 Ohio St.3d 54, 55, 514 N.E.2d 709, 712.

Sun first challenges the trial court's finding that Sun concealed a fact material to the transaction. It has generally been held that nondisclosure of a fact will become the equivalent of fraudulent concealment when it is the duty of the person to speak in order to place the other party on equal footing with him. *Mancini v. Gorick* (1987), 41 Ohio App.3d 373, 374, 536 N.E.2d 8, 9–10, citing 50 Ohio Jurisprudence 3d (1984) 431, Fraud and Deceit, Section 78. A seller has a duty to disclose material facts which are not "readily observable or discoverable through a purchaser's reasonable inspection." *Layman v. Binns* (1988), 35 Ohio St.3d 176, 178, 519 N.E.2d 642, 644; see also, *Miles v. McSwegin* (1979), 58 Ohio St.2d 97, 12 O.O.3d 108, 388 N.E.2d 1367. In determining whether a fact is material, the court must determine if the fact would be likely, "under the circumstances, to affect the conduct of a reasonable person with reference to the transaction in question." *Van Camp v. Bradford* (1993), 63 Ohio Misc.2d 245, 255, 623 N.E.2d 731, 737–738.

At trial, Davis testified that he was informed by a Sun representative that the tanks were twenty years old and must be removed prior to the sale. He further stated that, prior to the closing of the sale, the Sun representative told him that the tanks had, in fact, been removed from the ground. Davis then testified that he was not informed by Sun that the piping connecting the tanks to the pumping islands had not been removed:

"Q. At any time before you received the Deed, uh ... did anyone at Sun tell you that Sun had left the piping connections, uh ... to these tanks—coming from those tanks to the pump islands, in the ground?

"A. No.

"Q. Is that a fact that, uh * * * would be important to you?

"A. Certainly."

Davis also explained that he was aware of potential contamination problems caused by leaving the piping in the ground. He stated that he did not discover that the pipes had not been removed during his subsequent inspection of the property because the excavation pits had been filled in. Additionally, two expert witnesses testified that complete removal of the underground storage tank system would include the removal of the piping. Further expert testimony established that "good engineering practice" required removal of the piping.

Based on the above evidence presented at trial, we find, as did the trial court in the case, that it was reasonable for Davis to have inferred that removal of the tanks included removal of the piping. We further find that the evidence adequately supports the court's finding that Sun's failure to remove the piping was material to the transaction, and that Sun had a duty to disclose the fact that the piping was not removed because that fact was not apparent from inspection of the property.

 Sun next challenges the court's finding that Sun intended to mislead the Davises by concealing the nonremoval of the piping. The crux of Sun's argument here is that the trial court should not have been allowed to infer Sun's intent to mislead. However, as intent is rarely provable by direct evidence, it may be inferred from the "totality of the circumstances." *Klapchar v. Dunbarton Properties, Ltd.* (Nov. 4, 1991), Stark App. No. CA–8521, unreported, at 3, 1991 WL 249432; see, also, *Fulton v. Aszman* (1982), 4 Ohio App.3d 64, 72, 4 OBR 114, 123, 446 N.E.2d 803, 812–813. The fact that Sun knew that the piping remained in the ground is undisputable, since Sun removed the tanks that were connected to the piping. As Sun was in the petroleum business, it should have known of the contamination risks associated with leaving such piping in the ground after removal of the underground tanks, and that such information would be material to a potential buyer. Therefore, we find no error in the trial court's inference that Sun intended to mislead the Davises by concealing the nonremoval of the piping.

Finally, Sun challenges the court's finding that the Davises' justifiable reliance on the concealment proximately caused the injury. As to the element of justifiable reliance, Sun argues that Davis should have discovered, through his subsequent inspection of the property, that the piping had not been removed

because there was no sign of excavation in the areas where the piping was located. Thus, Sun contends, Davis could not have justifiably relied on Sun's concealment of the fact that the piping was not removed.

■ Our examination of the record demonstrates that there is some evidence to suggest that Davis's reliance on the concealment by Sun was not justifiable. It was established that Davis had some experience in the operation of service stations and understood where the piping was located on the property. However, we cannot say as a matter of law that there is no evidence to support the court's finding of justifiable reliance. Although Sun contends that Davis should have discovered that the piping was not removed because there was no sign of excavation in the areas where the piping was located, there is no testimony or other evidence in the record to support this inference. Davis was not directly asked, during either direct or cross-examination, whether he observed any signs of excavation in the areas where the piping was located. Furthermore, there was no testimony or other evidence concerning how such piping is removed from the ground or how the excavation site would appear if the piping had been removed. As stated above, Sun was in a superior position to know the status of the removal of the piping, and Davis plainly testified that he inspected the property after the removal of the tanks and did not discover that the piping had not been removed because the excavation pits had been filled in. The trial court was within its discretion to believe Davis's testimony.

We also find that the trial court's finding that the reliance proximately caused injury is adequately supported by the evidence. Multiple experts testified at trial that the petroleum remaining in the piping caused contamination of the soil. We find no error in the trial court's finding in that regard.

Additionally, we do not find the case of *Niecko v. Emro Marketing Co.* (C.A.6, 1992), 973 F.2d 1296, cited by Sun, persuasive here. *Niecko* involved an appeal from summary judgment whereas this case involves a full trial record.

The assignment of error is overruled.

■ As its fifth assignment of error, Sun raises the following:

"V. There is no evidence in the record to support the lower court's award of punitive damages."

In support of this assignment of error, Sun contends that the trial court erred in awarding punitive damages to the Davises based on its finding of fraudulent concealment. Sun does not challenge the amount of punitive damages awarded, but, rather, limits its argument to challenging the finding that punitive damages were appropriate in this case.

■ It is well established that punitive damages may be awarded in common-law fraud actions. *Byrley v. Nationwide Life Ins. Co.* (1994), 94 Ohio App.3d 1, 20, 640 N.E.2d 187, 199–200. To establish a claim for punitive damages in an action for fraud, the plaintiff must demonstrate, in addition to proving the elements of the tort itself, "that the fraud is aggravated by the existence of malice or ill will, or must demonstrate that the wrongdoing is particularly gross or egregious." *Charles R. Combs Trucking, Inc. v. Internatl. Harvester Co.* (1984), 12 Ohio St.3d 241, 12 OBR 322, 466 N.E.2d 883, paragraph three of the syllabus.

In this case, the trial court found that Sun acted with malice because it displayed a conscious disregard for the rights and safety of other persons that had a great probability of causing substantial harm. See *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174, syllabus. We find that this determination is adequately supported by the evidence presented at trial. Sun informed Davis of the need to remove the tanks, and then proceeded to remove the tanks, but not the connecting piping. After the removal, Sun filled in the excavation site and informed Davis that the tanks had been removed, but failed to inform him of the nonremoval of the piping. Evidence established that Sun should have known that the remaining piping presented a risk of contamination, and that good engineering practice required the removal of the piping. Concealing the fact that a potential source of contamination remained in the ground displayed a conscious disregard for the safety of other persons and certainly had a great probability of causing substantial harm. We find no error in the trial court's award of punitive damages.

The assignment of error is overruled.

■ On cross-appeal, the Davises allege five assignments of error. As their first assignment of error, the Davises raise the following:

"I. The trial court erred in not awarding the Davises damages for the loss of the contract of sale to United Dairy Farmers that was clearly within the acknowledged contemplation of all parties at the time of the contract for the cleanup."

In support of this assignment of error, the Davises argue that they were entitled to recover profits that were lost due to UDF's cancellation of the contract to purchase the property from them. They contend that all of the requirements for recovering lost profits were proven at trial, and, therefore, the trial court erred in failing to award such damages.

■ It is well established that, in certain cases, a defendant who is liable for breach of contract may also be liable to the plaintiff for lost profits. See *Kinetico, Inc. v. Indep. Ohio Nail Co.* (1984), 19 Ohio App.3d 26, 30, 19 OBR 92,

95–96, 482 N.E.2d 1345, 1350. Lost profits are generally recoverable if (1) such profits were within the contemplation of the parties at the time the contract was made, (2) the loss was the probable result of the breach, and (3) the profits are not remote and speculative. *Charles R. Combs Trucking, Inc. v. Internatl. Harvester Co.* (1984), 12 Ohio St.3d 241, 12 OBR 322, 466 N.E.2d 883, paragraph two of the syllabus. The amount of the lost profits, as well as their existence, must be proven with reasonable certainty. *Gahanna v. Eastgate Properties, Inc.* (1988), 36 Ohio St.3d 65, 521 N.E.2d 814, syllabus.

In this case, the trial court held that recovery of damages for lost profits was not appropriate because the Davises did not establish that the loss of the sales contract with UDF was the probable result of Sun's breach of the contract to remedy the contamination of the property. The trial court also held that lost profit damages were not appropriate because the evidence established that the property is still marketable.

A trial court enjoys a certain degree of latitude in "structuring damage awards in a manner most appropriate to the case before it." *Rhodes v. Rhodes Indus., Inc.* (1991), 71 Ohio App.3d 797, 809, 595 N.E.2d 441, 448. We find no error in the trial court's decision not to award lost profits damages in this case. Regardless of whether the Davises established that the alleged lost profits were the result of Sun's breach of contract, the evidence clearly established that the property, in a clean condition, was marketable. Davis testified that he recently received an offer from McDonald's to purchase the property for $325,000—approximately $50,000 more than the lost sales contract with UDF. Additionally, the Davises' real estate expert testified at trial that, once cleaned, the property would be "readily marketable." Therefore, we find that the trial court did not abuse its discretion in determining that the Davises were not entitled to recover lost profits as it is uncontroverted that they will, in fact, receive such profits when the property is sold.

The assignment of error is overruled.

As their second assignment of error, the Davises raise the following:

"II. The trial court erred and abused its discretion in not awarding a sufficient amount of punitive damages to deter fraudulent conduct, but only awarding actual damages of attorneys fees and expert fees incurred by the Davises in investigating the contamination and proving their case."

In support of this assignment of error, the Davises challenge the amount of punitive damages awarded in this case. They argue that the amount awarded was insufficient to deter future fraudulent conduct by Sun, and, therefore, a higher amount should have been awarded.

Punitive damages are awarded for the purpose of punishing the defendant for wrongful conduct and deterring such conduct in the future. See *Digital & Analog Design Corp. v. N. Supply Co.* (1992), 63 Ohio St.3d 657, 660, 590 N.E.2d 737, 740–741. The amount of punitive damages rests largely within the discretion of the finder of fact. *Villella v. Waikem Motors, Inc.* (1989), 45 Ohio St.3d 36, 40, 543 N.E.2d 464, 468–469. An award of punitive damages will generally not be overturned unless it bears no rational relationship or is so grossly disproportionate to the amount of compensatory damages awarded that the award appears to be the result of passion or prejudice. See *Shore, Shirley & Co. v. Kelley* (1988), 40 Ohio App.3d 10, 16, 531 N.E.2d 333, 339–340.

We find no error in the amount of punitive damages awarded in this case. The trial court awarded punitive damages in the amount of the Davises' attorney fees and litigation expenses. That amount was determined to equal $57,677.59, which is certainly not an inconsequential amount.

The assignment of error is overruled.

As their third, fourth and fifth assignments of error, the Davises raise the following:

"III. The trial court erred and abused its discretion in not admitting into evidence notes from Sun that evidenced its malice, ill will and spite toward the Davises, which were only disclosed at trial, merely because Sun did not have a representative present and none was subject to process to identify the notes.

"IV. In the event that this court were to reverse and remand for a new trial, the Davises assert that the trial court erred in dismissing their claim for damages and injunctive relief for private nuisance perpetrated by Sun.

"V. In the event that this court were to reverse and remand for a new trial, the Davises assert that the trial court erred and/or abused its discretion in denying them their right to trial by jury on the issues in this case."

By way of these assignments of error, the Davises raise substantive and procedural arguments relating to errors that would potentially affect the outcome of a new trial, if one were ordered. The Davises have neither alleged nor demonstrated that they were prejudicially affected by these alleged errors in the first trial as the verdict was in their favor. Therefore, in accordance with App.R. 12, and in light of our disposition of Sun's assignments of error above, we find these assignments of error moot.

The assignments of error are overruled.

The judgment of the trial court is reversed to the limited extent that the condition of the trial court's order of specific performance requiring it to be completed within one year is modified to require that the performance be

completed in an expeditious manner, in full accordance with the regulations and rules for such cleanup as promulgated by the state fire marshal. The judgment is affirmed in all other respects.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

WOLFF and GRADY, JJ., concur.