[Cite as *Auer v. Paliath*, 2013-Ohio-391.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

TORRI AUER, et al.                              :

    Plaintiff-Appellee                       :        C.A. CASE NO.   25158

v.                                              :        T.C. NO.    08CV9673

JAMIE PALIATH, et al.                           :          (Civil appeal from
                                           Common Pleas Court)

    Defendant-Appellant                      :

                                                :

. . . . . . . . . .

**O P I N I O N**

Rendered on the _____8th_____ day of _____February_____, 2013.

. . . . . . . . . .

LAURENCE A. LASKY, Atty. Reg. No. 0002959, One First National Plaza, Suite 830, 130 W. Second Street, Dayton, Ohio 45402
      Attorney for Plaintiff-Appellee

THOMAS H. PYPER, Atty. Reg. No. 0022981 and P. CHRISTIAN NORDSTROM, Atty. Reg. No. 0065439, 7601 Paragon Rd., Suite 301, Dayton, Ohio 45459
      Attorneys for Defendant-Appellant Keller Williams Home Town Realty, Inc.

JOHN H. BURTCH, Atty. Reg. No. 0025815 and ROBERT J. TUCKER, Atty. Reg. No. 0082205, 65 East State Street, Suite 2100, Columbus, Ohio 43215
      Attorneys for Amicus Curiae the Ohio Association of Realtors

JAMIE A. PALIATH, 4011 Laguna Road, Trotwood, Ohio 45426
     Defendant-Appellant, Pro Se
                                    . . . . . . . . . .

FROELICH, J.

{¶ 1}   Torri Auer[1] brought suit against real estate salesperson Jamie Paliath, real estate broker Keller Williams Home Town Realty, and others based on alleged fraud by Paliath in the sale of several rental properties to Auer and in Paliath's management and rehabilitation of those properties.  After a jury trial in the Montgomery County Court of Common Pleas, Paliath was found liable to Torri Auer in the amount of $135,200 for fraud in the inducement of Auer's purchases of the properties.  (The jury found additional damages against Paliath for other claims.)  The jury also awarded $135,200 to Auer from Home Town Realty, based on the broker's vicarious liability for Paliath's actions in connection with Auer's purchases of the properties.[2]  Court costs were assessed against both Paliath and Home Town Realty.

{¶ 2}   Home Town Realty appeals from the trial court's judgment, claiming that (1) the company should have been granted a direct verdict due to the plaintiffs' failure to establish damages and (2) the trial court erred in its jury instructions on vicarious liability.  Paliath also filed a notice of appeal (Case No. 25165), but that case has been dismissed for lack of prosecution.  Accordingly, our Opinion concerns only the issues raised by Home Town Realty.

---

[1] Auer's former husband, Thomas Auer, and Rapid Realty Solutions, Inc. were also named plaintiffs.   Hari Paliath, Paliath's ex-husband, was named as an additional defendant.   These parties are not relevant to this appeal.

[2] The trial court's judgment awards $135,000, rather than $135,200, to Auer from Home Town Realty.   This appears to be a typographical error.

I.

**{¶ 3}** Torri Auer's claims against Home Town Realty arise from a series of real estate transactions that occurred between October 5, 2007 and December 19, 2007, when Paliath was a real estate salesperson for Home Town Realty, a real estate brokerage firm.

**{¶ 4}** Upon completing her real estate course work, Jamie Paliath began working as a licensed real estate salesperson for Home Town Realty of Vandalia, LLC, which operated as Keller Williams Home Town Realty. Paliath's contract with Home Town Realty, dated August 17, 2006, provided that Paliath would be employed as an independent contractor to assist clients with the purchase and sale of real estate. Paliath could determine her own business hours and choose her "own target clients, marketing techniques and sales methods;" Home Town Realty was not required to pay her taxes, insurance, licensing fees, and other expenses she might incur as a salesperson. Paliath's income consisted of commissions earned on real estate transactions in which Home Town Realty represented a client as buyer or seller, and all commissions were to be disbursed through Home Town Realty in accordance with Keller Williams' policies and guidelines. According to real estate broker Timothy Stammen, owner of Home Town Realty, Paliath received 70 percent of earned commissions and Home Town Realty received 30 percent.

**{¶ 5}** In September 2007, Torri Auer, a California resident, contacted Paliath regarding a duplex in Dayton that she had found on an internet website, Bid4Assets. Auer traveled to Ohio to view the property. Auer informed Paliath that she was interested in owning investment property to support herself and her children; she opted not to purchase that duplex because it was too expensive.

{¶ 6} Paliath drove Auer to see several other properties, including 929-931 Harvard Boulevard, 117 Belton Street, 2259 Emerson Avenue, 1111-1115 Richmond Avenue, and 1119 Richmond Avenue. The Harvard property was a duplex, the Emerson property had 12 units, the Belton property was a single-family home, and the three Richmond properties had 4 units each. Auer went inside one half of the Harvard duplex, and she saw a photograph of the inside of the Belton property. Auer did not see the inside of the Richmond properties. Paliath told Auer that a lot of work had been done on the Belton property, that it was rented, and that it could rent for $400 per month.

{¶ 7} In late September 2007, Auer contracted to purchase the Harvard property for $40,000 and the Belton property for $20,000, based in part on representations that the properties were worth twice those prices. Auer also contracted with A-1 Property Management, a company created by Paliath, to manage the Harvard and Belton properties. At the closing for both properties, Home Town Realty received a commission of $665 for the sale of the Harvard property and $180 for the sale of the Belton property.

{¶ 8} Auer and Paliath together created the Gem City Investment Group, which bought the Emerson property for $73,000 in November 2007. The company also signed a contract with Miami Valley Home Improvements, LLC, another company created by Paliath, to rehabilitate the Emerson property for $103,000.

{¶ 9} On November 16, 2007, Auer's company, Rapid Realty Solutions, contracted to purchase 1111 and 1115 Richmond Avenue from Kermali Holdings, LLC for $40,000 each. Paliath had represented to Auer that there was a list of people waiting to rent the units, that the property could be rehabilitated by January 2008, and that the properties could quickly be sold for $90,000 each. The sale of the properties closed on December 14,

2007; Paliath was the sole real estate salesperson involved, and Home Town Realty received commissions from the sales. Auer contracted with Miami Valley Home Improvements to rehabilitate the properties for $23,500 each, with the work scheduled to be completed by January 30, 2008.

{¶ 10} On November 16, 2007, Rapid Realty Solutions also contracted to purchase 1119 Richmond Ave for $60,000. The seller of this building was Miami Valley Custom Homes, Inc., another company created by Paliath. Paliath, through Miami Valley Custom Homes, had purchased the property for between $8,000 and $9,000 shortly before selling the property to Auer. Rapid Realty Solutions closed on the purchase on December 19, 2007. Home Town Realty was listed as the broker for the transaction, and it received $3,600 at settlement.

{¶ 11} Home Town Realty returned Paliath's real estate salesperson license to the State of Ohio on December 7, 2007. Paliath arranged to continue as a real estate salesperson under her own company, The Investment Genie Realty Group (TIG Realty), with Judith Lancaster as her broker. Paliath operated her real estate management and rehabilitation companies from the same office.

{¶ 12} Paliath managed Auer's properties until October 2008, and Miami Valley Home Improvements spent the money Auer had provided for the rehabilitation of the Emerson property and two of the Richmond Avenue properties. Some of the units had tenants between the closings and October 2008, but Auer received no income from the properties. In August 2008, only one out of the 27 total units was rented.

{¶ 13} In October 2008, Auer visited each of the properties with Lancaster, Janice

Kemmer (a licensed realtor who worked for TIG Realty, assisting with property management and rentals), and Darrin Carey (Kemmer's son, a real estate investor who rehabilitates properties and rents them). Auer asked Carey to evaluate the work that needed to be done and the current condition of the properties. All of the properties were in disrepair and needed a substantial amount of work.

{¶ 14} On October 24, 2008, Auer brought suit against Paliath, Home Town Realty, and others, claiming fraud in the inducement in the sale of the properties, among other claims. The matter proceeded to trial in March 2012.

{¶ 15} At the conclusion of Auer's case, Home Town Realty requested a directed verdict. First, the broker argued that it had an independent contractor relationship with Paliath. Home Town Realty acknowledged that it had a fiduciary duty as a broker to account for the money in the real estate transactions, but it claimed that the evidence established that it had complied with that duty. It further argued that it did not breach any duty to supervise Paliath. Second, Home Town Realty stated that the measure of damages was the difference between the represented value of the property and the actual value at the time of the transaction. Home Town Realty asserted that Auer had failed to prove the actual value of the properties at the time of the purchases. The court denied the motion regarding Home Town Realty's duty as a broker, and it took the issue of damages under advisement.

{¶ 16} Prior to closing arguments, Home Town Realty renewed its motion for a directed verdict on damages. The trial court denied the motion. The broker also objected to the trial court's proposed jury instructions on vicarious liability.

{¶ 17} Following closing arguments, the court instructed the jury concerning

Home Town Realty's liability. It began by defining vicarious liability and scope of employment. The trial court concluded that portion of the jury instructions by stating that, if the jury finds that Paliath "committed fraud" with respect to the sale of the Belton Street, Harvard Boulelvard, Emerson Avenue, and Richmond Avenue properties to Auer, then Home Town Realty "is vicariously liable" and the jury must find in favor of Auer and against Home Town Realty in the amount of Auer's damages. The court further instructed that if the jury finds that Paliath did not commit fraud with respect to the sale of those properties to Auer, then the verdict must be in favor of Home Town Realty and against Auer. Home Town Realty objected to the instruction that the jury must find Home Town Realty vicariously liable if it finds that Paliath "committed fraud."

{¶ 18} During deliberations, the jury sent a written question to the trial judge, asking "If we sign for Plaintiff Torri Auer with respect to interrogatory #2 (fraudulent inducement to purchase real estate) are we required to find for plaintiff Torri Auer against Keller Williams?" The trial court responded with a written instruction to refer to the jury instructions previously given. The jury ultimately found for Auer and against Paliath on Auer's claim of fraudulent inducement to purchase the pieces of real estate, as follows: (1) $15,000 for 117 Belton Street, (2) $0 for 929-931 Harvard Boulevard, (3) $0 for 2259 Emerson Avenue, (4) $68,800 for 1111-1115 Richmond Avenue, and (5) $51,400 for 1119 Richmond Avenue, for a total of $135,200. The jury also found for Auer and against Home Town Realty in the amount of $135,200.[3]

---

[3] Home Town Realty notes that judgment was entered in favor of Auer individually regarding the Richmond Avenue properties, even though Rapid Realty Solutions was the actual purchaser. *See* Home Town Realty's appellate brief, fn. 2 (noting "discrepancies" in the trial court's judgment entry) and pp. 13-14 (discussing the evidence at trial regarding damages for the

{¶ 19} Because the jury did not award any damages against Paliath and Home Town Realty regarding 929-931 Harvard Boulevard and 2259 Emerson Avenue, we will not discuss those properties further.

II.

{¶ 20} Home Town Realty raises two assignments of error. We begin with the second assignment of error, which states:

THE TRIAL COURT ERRED IN ITS INSTRUCTION AS TO THE POTENTIAL VICARIOUS LIABILITY OF HOME TOWN.

{¶ 21} Home Town Realty's second assignment of error claims that the trial court's instruction to the jury on Home Town Realty's vicarious liability for the actions of Paliath was erroneous, ambiguous, misleading, and prejudicial. It specifically challenges the court's instruction that, if the jury finds that Paliath "committed fraud" with respect to the properties, then "Defendant Keller Williams Home Town Realty of Vandalia is vicariously liable and you must find in favor of Plaintiff Torri Auer and against Keller Williams Home Town Realty of Vandalia in the amount of Plaintiff Torri Auer's damages."

{¶ 22} The Ohio Association of Realtors, which has filed a brief as amicus curiae, supports Home Town Realty's challenge to the trial court's jury instructions. The OAR asserts that Paliath was an independent contractor, as a matter of law, and that the trial court should never have instructed the jury on vicarious liability. The OAR contends that, at the least, the trial court should have allowed the jury to determine whether Paliath was an

Richmond Avenue properties). However, Home Town Realty did not raise the issue as an assignment of error, and we will not address it.

independent contractor. Alternatively, the OAR claims that, even assuming that Paliath was not an independent contractor, the trial court erred in failing to instruct the jury that it had to find that Paliath was acting within the scope of her employment before determining whether Home Town Realty was vicariously liable. The OAR asserts that Paliath's actions, as a "rogue salesperson" acting outside of the broker's knowledge, were not within the scope of her employment.

{¶ 23} In response to Home Town Realty and the Ohio Association of Realtors, Auer emphasizes that the trial court's instruction was consistent with *Commercial Business Sys. v. Aztec Partnership*, 2d Dist. Montgomery No. 16363, 1997 WL 674659 (Oct. 31, 1997), and that Home Town Realty received a commission for the sale of the Belton Street and Richmond Avenue properties. Auer argues that Paliath was not an independent contractor, that Home Town Realty acted as the broker in receiving the commissions, and that Home Town Realty was vicariously liable for Paliath's actions in connection with the sale of these properties.

{¶ 24} The Ohio Supreme Court has not addressed the nature of the legal relationship between real estate brokers and real estate salespersons, and that relationship is not clearly defined by R.C. Chapter 4735. Under R.C. Chapter 4735, the term "real estate broker" includes "any person, partnership, association, limited liability company, limited liability partnership, or corporation * * * who for another * * * and who for a fee, commission, or other valuable consideration" engages in various activities regarding real estate, including selling, purchasing, leasing, renting, listing, auctioning, buying, managing, and advertising real estate. R.C. 4735.01(A). A real estate salesperson generally means

"any person *associated with a licensed real estate broker* to do or to deal with any acts or transactions set out or comprehended by the definition of a real estate broker, for compensation or otherwise." (Emphasis added.) R.C. 4735.01(C). *See* R.C. 4735.01(I) for exceptions to the definitions of real estate broker and real estate salesperson.

{¶ 25} Under R.C. 4735.21, no real estate salesperson may collect any money in connection with any real estate transaction, except as in the name of and with the consent of the licensed real estate broker under whom the salesperson is licensed.

{¶ 26} We have addressed the relationship between real estate brokers and real estate salespersons, with differing results based on the circumstances presented. In *Burton Minnick Realty, Inc. v. Leffel*, 2d Dist. Clark No. 2680, 1990 WL 140527 (Sept. 28, 1990), the principal issue concerned the validity of a covenant not to compete which was included in the contract between a real estate broker and its former salesperson. The salesperson contended that the covenant was unenforceable because the salesperson had contracted with the broker as a independent contractor, which the salesperson asserted was an invalid relationship under R.C. Chapter 4735. The salesperson argued, citing *Fulton v. Aszman*, 4 Ohio App.3d 64, 446 N.E.2d 803 (12th Dist.1982) and R.C. 4735.09, that a salesperson may not work independently of a licensed broker. R.C. 4735.09(A), pertaining to applications for a salesperson license, requires, among other things, that the application is "to be accompanied by the recommendation of the real estate broker with whom the applicant is associated or intends to be associated, * * *." *Aszman* held that "a real estate salesman is given no right to conclude a sale. He is an associate of a licensed real estate broker, who by definition is the one who sells. It will also be observed that a licensed real estate salesman

has no independent status.  He is an associate of a licensed real estate broker and can only function through the broker with who he is associated."  *Aszman* at 71.

{¶ 27}  We agreed with the salesperson's argument that a salesperson cannot act independently of a broker.  However, we did not agree that the salesperson's "independent contractor status does not satisfy the statutory requirement that she be associated with a broker."  We reasoned in *Burton*:

> Leffel interprets *Aszman* and the statute as mandating that the only acceptable relationship under the statute is that of employer-employee, and argues that the agreement, in that it creates something other than an employer-employee relationship, is void.  Neither the statute nor *Aszman* support such a result.  An independent contractor can be associated with a broker and satisfy the statute.  Since the contract specifies that Burton-Minnick agreed to provide training, work facilities, and commissions to Leffel, it is obvious that the parties understood that Leffel would not be working independently of the broker, although she was an independent contractor.  Since this association complies with the statute, the contract creating the relationship is not void.  Therefore, we reject this argument.

{¶ 28}  In another case involving a dispute between a real estate broker and a real estate salesperson regarding commissions, we noted, without discussion, that it was "undisputed" that the real estate salesperson was an independent contractor.  *Hall v. Nisonger*, 2d Dist. Darke No. 1385, 1996 WL 144191 (Mar. 29, 1996).

{¶ 29}  Subsequently, in *Commercial Business Sys. v. Aztec Partnership*, 2d Dist.

Montgomery No. 16363, 1997 WL 674659 (Oct. 31, 1997), we addressed whether a real estate broker could be vicariously liable for the fraudulent conduct of her former sales agent. The broker argued that she should not have been found vicariously liable because the salesperson's conduct was outside the scope of the agency relationship. (We find no indication that the broker asserted that her salesperson was an independent contractor.) We affirmed the trial court's finding, after a bench trial, that the broker was vicariously liable, stating:

> A real estate broker will be held vicariously liable for intentional torts committed by salesmen acting within the scope of their authority. *Zell v. Ohio Superintendent of Real Estate* (1992), 79 Ohio App.3d 297, 607 N.E.2d 99. Vicarious liability is appropriate because a real estate salesman has no independent status or right to conclude a sale and "can only function through the broker with whom he is associated." *Wolf v. Hyman* (1957), 104 Ohio App. 32, 35, 143 N.E.2d 633. A salesman is required to be under the supervision of a licensed broker in all of his activities related to real estate transactions. *Fulton v. Aszman* (1982), 4 Ohio App.3d 64, 71, 446 N.E.2d 803.

> In *Zell*, the court imposed vicarious liability on a brokerage firm for a salesman's tortious conduct when it found that he had acted on behalf of the firm. The court found significant the fact that a newspaper advertisement had clearly indicated to the sellers that the salesman was acting on behalf of the firm. Moreover, the court concluded that the salesman was acting within

the scope of his employment even though he had contacted the sellers at their home rather than at the firm. Just like the real estate salesman in *Zell,* Lawson [the salesperson] acted on behalf of Montgomery [the broker] when he contacted Commercial about Aztec's purchase offer. Montgomery had introduced Sheibenberger [the client] to Lawson and had indicated to Sheibenberger that Lawson would be acting on her behalf. Contrary to Montgomery's assertion that Lawson acted outside the scope of employment because the listing agreement had expired before the transaction had occurred, Sheibenberger testified that Lawson had made an offer and inspected the properties in December while the listing agreement was still in effect. (May 17, Tr. at 29).

Because there was evidence establishing that Lawson acted within the scope of employment, the trial court reasonably concluded that Montgomery was vicariously liable for his tortious conduct.

{¶ 30} It may appear, at first blush, that *Commercial Business Sys.* represents a departure from our prior case law. However, our cases are not inconsistent. Rather, we have recognized that a real estate salesperson may lawfully be "associated with" a licensed real estate broker, as required by R.C. Chapter 4735, as an independent contractor. The contractual relationship between a real estate broker and a real estate salesperson may specify that the real estate salesperson is an independent contractor, and that relationship may be valid with respect to the disputes between those two parties. Whether a real estate salesperson is associated with a broker as an employee or an independent contractor depends

on the particular circumstances surrounding the relationship.

{¶ 31} We have treated the relationship between real estate brokers and their real estate salespersons as a principal-agent relationship, however, when the issue involves a real estate broker's or real estate salesperson's conduct concerning third parties. Because a real estate salesperson is required to be under the supervision of a licensed real estate broker in all of his or her activities related to real estate transactions, we have held that a real estate broker cannot insulate him or herself from liability for intentional torts committed within a real estate salesperson's scope of employment.

{¶ 32} This hybrid approach is not unique. Other states that have mandated supervisory control by a real estate broker have established different standards for the liability of a real estate broker depending on the parties and issues involved in the dispute. In California, for example, "[a] real estate broker and a real estate salesperson licensed under that broker may contract between themselves as independent contractors or as employer and employee, for purposes of their legal relationship with and obligations to each other." *Reagan v. Keller Williams Realty, Inc.*, Cal.App. 2 Dist. No. B192890, 2007 WL 2447021 (Aug 30, 2007); West's Ann.Cal.Bus. & Prof.Code 10032. However, "[i]t is settled that for purposes of liability to third parties for torts, a real estate salesperson is the agent of the broker who employs him or her. The broker is liable as a matter of law for all damages caused to third persons by the tortious acts of the salesperson committed within the course and scope of employment. * * * Thus, for purposes of tort liability, a real estate agent-broker relationship may not be characterized as that of an independent contractor when the salesperson is acting within the scope of employment." (Internal citations omitted.)

*Reagan* at \*9-10.

{¶ 33} The State of Connecticut defines a real estate salesperson as "a person affiliated with any real estate broker as an independent contractor or employed by a real estate broker to list for sale, sell or offer for sale, to buy or offer to buy or to negotiate the purchase or sale or exchange of real estate, * * *." Conn.Gen.Stat.Ann. 20-311(2). The statute further explicitly provides that, "[i]n any action brought by a third party against a real estate salesperson affiliated with a real estate broker as an independent contractor, such broker shall be liable to the same extent as if such affiliate had been employed as a real estate salesperson by such broker." Conn.Gen.Stat.Ann. 20-312a. Other states have similar statutes. *E.g.*, Del.Code Ann. 2937(d) ("* * * Notwithstanding any other provision of this chapter, the employer of the licensee is vicariously liable as the employer would be under the doctrine of respondeat superior whether the licensee is employed by the broker or brokerage organization as an employee or as an independent contractor.").

{¶ 34} The situation before us involves allegations of fraudulent misrepresentations by a real estate salesperson, Paliath, to a third party buyer of property, Auer. Under these circumstances, the liability of the real estate broker, Home Town Realty, is governed by *Commercial Business Sys.* (intentional torts as to third parties concerning real estate transactions) and not *Burton* (contractual dispute between the real estate broker and real estate salesperson). We need not decide whether Paliath was an independent contractor with respect to her relationship with Home Town Realty, as that issue is irrelevant to whether Home Town Realty was properly held vicariously liable for Paliath's tortious conduct in the sale of the properties to Auer.

**{¶ 35}** We therefore turn to whether the trial court properly instructed the jury with respect to Home Town Realty's vicarious liability. The trial court instructed the jury regarding Home Town Realty as follows:

The Plaintiff also alleges that Defendant Keller Williams Hometown Realty of Vandalia was the real estate broker responsible for supervising Defendant Jamie Paliath at the time of the real estate sales at issue in this case.

A real estate broker is vicariously liable for intentional torts committed by salesmen acting within the scope of their authority. A salesman is required to be under the supervision of a licensed broker in all of her activities related to real estate transactions.

Vicarious liability means that the broker, in this case Defendant Keller Williams Hometown Realty of Vandalia, is bound by action taken on its behalf by a realtor, in this case Defendant Paliath, while acting within the scope of her authority.

A real estate agent is not within the scope of her agency when she clearly and completely departs from the services or job that she was hired to do. When an agent acts solely for her own benefit, or solely for the benefit of a person other than her broker, she does not act within the scope of her agency, and the broker is not liable for the agent's acts.

If you find that Defendant Jamie Paliath committed fraud with respect to the sale of 117 Belton Street, 929-931 Harvard Blvd, 2259 Emerson

Avenue, 1111-1115 Richmond Avenue and 1119 Richmond to Plaintiff Torri Auer, then Defendant Keller Williams Hometown Realty of Vandalia is vicariously liable and you must find in favor of Plaintiff Torri Auer and against Defendant Keller Williams Hometown Realty of Vandalia in the amount of Plaintiff Torri Auer's damages. If you find that Defendant Jamie Paliath did not commit fraud with respect to the sale of 117 Belton Street, 929-931 Harvard Blvd, 2259 Emerson Avenue, 1111-1115 Richmond Avenue and 1119 Richmond to Plaintiff Torri Auer, then your verdict must be in favor of Defendant Keller Williams Hometown Realty of Vandalia and against Plaintiff.

{¶ 36} As a threshold matter, Auer claims that Home Town Realty waived its objections to the jury instructions because it never submitted any written jury instructions relating to vicarious liability, did not object to the interrogatories, and "did not object to the Trial Court's response regarding jury instructions as noted in the transcript."

{¶ 37} Prior to closing arguments, the trial court and counsel reviewed a preliminary version of the jury instructions. At that time, counsel for Home Town Realty voiced an objection to the vicarious liability instruction on that ground that, "[i]nstead of giving the tools to the jury to decide the issues, [the jury instruction] decides it for them, and we think that the better approach is to read the section on intentional torts by employees, I believe 537, instead of writing it out in this fashion." (Counsel had not provided a written proposed instruction on vicarious liability.) The court overruled the objection. During a review of the final revisions to the jury instructions, Home Town Realty again voiced its

objections to the vicarious liability instruction.   And at the conclusion of the reading of the jury instructions, the court asked counsel if they had any additions, corrections, or deletions to the instructions as read.   Counsel for Home Town Realty responded, "Your Honor, other than what we've discussed, no objection.   Thank you."   Home Town Realty's objection to the instruction on vicarious liability was sufficiently preserved for appeal.

{¶ 38}   Home Town identifies four "major flaws" in the court's instruction on vicarious liability.   First, it asserts that the court failed to inform the jury that it was being asked to determine whether Paliath was acting within the scope of her employment. Second, Home Town Realty states that the court's jury instruction failed to inform the jury that Auer had the burden to prove that Paliath was acting within the scope of her employment.   Third, the broker claims that the trial court's jury instruction misled the jury into believing that "the scope of a real estate agent's authority is necessarily all-inclusive," i.e., that the scope of employment included all of Paliath's activities.   Finally, Home Town Realty argues that the trial court's directive to find against the broker if Paliath "committed fraud" also lacked any reference to the fact that the broker's liability was limited to actions taken by Paliath within the scope of her employment.

{¶ 39}   "A trial court must give jury instructions that correctly and completely state the law." *Groob v. Key Bank*, 108 Ohio St.3d 348, 2006-Ohio-1189, 843 N.E.2d 1170, ¶ 32.   "Under the doctrine of respondeat superior, a principal or employer may generally be held liable for tortious acts committed by its agents or employees if such acts occur within the scope of the employment relationship." *Pierson v. Rion*, 2d Dist. Montgomery No. 23498, 2010-Ohio-1793, ¶ 44, citing *Clark v. Southview Hosp. & Family Health Ctr.,* 68

Ohio St.3d 435, 438, 628 N.E.2d 46 (1994).

{¶ 40} For an act to fall within the scope of employment, it must be "calculated to facilitate or promote the business for which the [employee or agent] was employed." *Osborne v. Lyles*, 63 Ohio St.3d 326, 329, 587 N.E.2d 825 (1992). In general, if an act is committed within the scope of employment, it will be authorized, either expressly or impliedly, by the employer. *Anousheh v. Planet Ford, Inc.,* 2d Dist. Montgomery Nos. 21960 & 21967, 2007-Ohio-4543, ¶ 45. Intentional and willful acts by an agent or employee "to vent his own spleen or malevolence against the injured person" are generally outside the scope of employment. *Osborne,* 63 Ohio St.3d at 329, 587 N.E.2d 825. Stated differently, "an employer is not liable for independent self-serving acts of his employees which in no way facilitate or promote his business." *Groob* at ¶ 42, citing *Byrd v. Faber*, 57 Ohio St.3d 56, 59, 565 N.E.2d 584 (1991).

{¶ 41} We find no fault with the trial court's jury instructions on the definitions of vicarious liability and scope of employment. The portion defining when a person departs from the scope of employment tracks the language of Ohio Jury Instruction 537.07(11). Although some of the language was tailored to the real estate broker/ real estate salesperson scenario, the instructions defining vicarious liability and scope of employment were adequate representations of the law. *Accord Commercial Business Sys. v. Aztec Partnership*, 2d Dist. Montgomery No. 16363, 1997 WL 674659 (Oct. 31, 1997); *Osborne*, 63 Ohio St.3d at 330, 587 N.E.2d 825 (1992); *State ex rel. Atty. Gen. of Ohio v. State Line Agri, Inc.*, 2d Dist. Darke No. 2010 CA 11, 2011-Ohio-2191, ¶ 15-17. In addition, given the unique hybrid relationship that real estate brokers and real estate salespersons have under

R.C. Chapter 4735 and common law, the court appropriately did not ask the jury to determine whether Paliath was an employee or an independent contractor of Home Town Realty.

{¶ 42}  Home Town Realty argues that the trial court's jury instruction improperly removed from the jury the question of whether Paliath was acting within the scope of her employment with Home Town Realty when she committed fraud in the sale of the properties to Auer.  Whether an employee is acting within the scope of his employment is generally a question to be decided by the trier of fact.  *Osborne* at 330.  "Only when reasonable minds can come to but one conclusion does the issue regarding scope of employment become a question of law."  *Id.*

{¶ 43}  Auer responds that, as a matter of law, Paliath was acting within the scope of her authority with Home Town Realty when she sold the properties to Auer.  Auer cites to Opinion 2006-1 of the Ohio Supreme Court's Board of Commissioners on Grievances and Discipline, which stated that "[a] licensed real estate salesperson is the agent of a licensed real estate broker for whom he works as a matter of law when commissions are collected in the name of the broker."  *Id*., citing *Bunch v. Tom Althauser Realty, Inc.*, 55 Ohio App.2d 123, 129, 379 N.E.2d 613 (10th Dist.1977).

{¶ 44}  The Board of Commissioners on Grievances and Discipline relied on *Bunch*, which concerned whether a real estate broker was responsible for the return of a deposit received by a real estate salesperson associated with the broker when the deposit was never received by the broker due to a criminal act by the salesperson.  The trial court in *Bunch* had "analyzed the case strictly on common law agency principles and excused the broker on the

basis that the purchaser was put on notice that the salesman may have been exceeding his authority and that further inquiry from the broker would have disclosed the salesman's actual authority." *Bunch* at 128.

{¶ 45}     The Tenth District reversed, noting that while the principles of law set forth by the trial court are ordinarily valid common law principles, they do not apply to this situation due to R.C. 4735.21 (prohibiting collection of money by real estate salespersons in connection with any real estate brokerage transaction). *Bunch* at 128. The appellate court stated:

> The question is whether the intent of this statute is to make the collection of the deposit a transaction of the broker irrespective of whether the broker has actually authorized the salesman to collect the money, thus altering the common law liability of a principle [sic] for the unauthorized acts of his agent. We find that R.C. 4735.21 makes the real estate salesman the agent of the licensed real estate broker for whom he is working as a matter of law when commissions are collected by the salesman in the name of the broker. Barnes had authority to collect deposits in the name of Tom Althauser Realty, Inc. The deposit was collected in the name of and on the contract form of his broker for the sale of property listed by the broker. A broker cannot limit or place conditions upon his consent for a salesman to collect commissions in his name so that the burden is placed upon a purchaser to ascertain the actual authority that the salesman has from the broker to accept commissions.

The case does not turn on whether Barnes violated instructions given him by the broker in regard to handling deposits nor whether Barnes was an independent contractor rather than an employee of Althauser for other purposes. Thus, the issue of whether plaintiff as a prudent man ought to have inquired further to determine the actual authority of Barnes was immaterial. The broker is responsible for the return of $7,500 deposit collected by his salesman in his name, even though the broker has never received the deposit because of the criminal act of the salesman.

*Id*. at 129.

{¶ 46} The Board of Commissioner's advisory opinion is not binding authority and *Bunch* is factually distinguishable. Nevertheless, we agree with the general principles they espouse. Under R.C. 4735.21, a real estate salesperson cannot complete a real estate transaction outside of his or her association with a licensed real estate broker. As a result, when a real estate salesperson acts in the name of a real estate broker in connection with the type of real estate transaction for which he or she was hired and the broker collects a commission for the transaction, the salesperson's actions in connection with that real estate transaction are within the scope of the salesperson's employment, as a matter of law.

{¶ 47} In this case, Paliath contracted with Home Town Realty as a real estate salesperson to assist clients with the purchase and sale of real estate. Paliath advised and assisted Auer in the purchase of the Belton Street, Harvard Boulevard, and Richmond Avenue properties, and her fraudulent conduct involved misrepresentations regarding those properties.

{¶ 48} Reviewing the properties separately, the evidence at trial established that Home Town Realty was listed as the real estate broker on the purchase contract, the agency disclosure statement, and the settlement statement for the Belton Street sale. Home Town Realty received a commission check of $180 from the title company that conducted the closing. Based on this evidence, it was established, as a matter of law, that Paliath acted within the scope of her employment as a real estate salesperson with Home Town Realty in relation to Auer's purchase of the Belton property.

{¶ 49} Similarly, Paliath's actions with respect to the 1111-1115 Richmond Avenue properties were taken as a real estate salesperson assisting Auer with the purchase of the properties. Home Town was listed as a broker on the purchase contract, the agency disclosure statement, and the settlement statement for 1111 Richmond Avenue, and it received a commission of $2,400 following the closing. Paliath signed the deposit receipt portion of the purchase contract as an associate of Home Town Realty. Auer signed Home Town Realty's "Do Not Call"/"Do Not Spam" Policy. The evidence thus demonstrated, as a matter of law, that Paliath was acting in the scope of her employment regarding the sale of 1111 Richmond Avenue.

{¶ 50} The purchase of 1119 Richmond Avenue differs from the others only in the respect that Auer purchased 1119 Richmond Avenue from Miami Valley Custom Homes, Inc., a company created by Paliath. Paliath acknowledged that she was the owner of the property and that she had purchased the property for between $8,000 and $9,000 shortly before selling the property to Auer for $60,000.

{¶ 51} Miami Valley Custom Homes signed an exclusive right-to-sell contract

with Home Town Realty for 1119 Richmond Avenue, which Paliath initialed for Miami Valley Custom Homes and signed for Home Town Realty. The agency disclosure statement for Auer's purchase of the property indicates that Paliath was the salesperson and Home Town Realty was the broker for the transaction, and that Paliath would be acting as a "dual agent;" Paliath signed the form as the seller. Paliath signed the lead-based paint disclosure form and home warranty service agreement as the salesperson for Home Town Realty. Home Town Realty was the named broker on the contract to purchase the property and the settlement statement, and it received a commission for the sale. We note that Timothy Stammen was asked whether Home Town Realty had "any rules related to independent contractors selling real estate to * * * other individuals that they in fact own themselves." Stammen responded, "As long as it's disclosed, no." Judith Lancaster agreed that Paliath had a fiduciary duty to disclose her interest in the property.

**{¶ 52}** Accordingly, as to the Belton Street property and the three Richmond Avenue properties, Paliath was acting within the scope of her employment, as a matter of law, when she advised and assisted Auer with the purchases of these properties. We therefore conclude that any error in the trial court's failure to instruct the jury that Paliath was required to act within the scope of her employment with Home Town Realty in order for the broker to be liable for Paliath's actions concerning the sale of those properties was harmless.

**{¶ 53}** Home Town Realty's second assignment of error is overruled.

III.

**{¶ 54}** Home Town Realty's first assignment of error states:

THE TRIAL COURT ERRED IN NOT DIRECTING A VERDICT IN FAVOR OF HOME TOWN INASMUCH AS MS. AUER FAILED TO ADDUCE ANY COMPETENT PROOF OF DAMAGES.

**{¶ 55}** Home Town Realty's first assignment of error claims that Auer failed to present evidence of the actual value of the properties at the time she purchased them. The broker thus claims that the trial court should have entered a directed verdict in Home Town Realty's favor.

**{¶ 56}** Civ.R. 50(A)(4) provides:

When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.

**{¶ 57}** A motion for a directed verdict challenges the sufficiency of the evidence; this is a question of law, not of fact. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 25. "[T]he court must determine whether any evidence exists on every element of each claim or defense for which the party has the burden to go forward." *Id.* We review de novo the trial court's ruling on a motion for a directed verdict. *Ward v. Govt. Emps. Ins. Co.*, 2d Dist. Montgomery No. 24884, 2012-Ohio-2970, ¶ 13.

**{¶ 58}** "Where there is fraud inducing the purchase or exchange of real estate, Ohio courts have held that the proper measure of damages is the difference between the

value of the property as it was represented to be and its actual value at the time of purchase or exchange. This is known as the 'benefit of the bargain' rule. * * * Courts have also held that the cost of repair or replacement is a fair representation of damages under the benefit of the bargain rule and is a proper method for measuring damages." (Citations omitted.) *McCoy v. Good*, 2d Dist. Clark No. 06 CA 34, 2007-Ohio-327, ¶ 21, quoting *Brewer v. Brothers*, 82 Ohio App.3d 148, 154, 611 N.E.2d 492 (12th Dist.1992). *See Molnar v. Beriswell*, 122 Ohio St. 348, 171 N.E. 593 (1930), syllabus. Expert testimony is not always required to establish the amount of damages. *See id.*

{¶ 59} The trial court instructed the jury: "With respect to the sales of the real estate at issue, the measure of damages in this case is the difference between the represented value and the actual value at the time of the transaction." The court did not further define "represented value" or "actual value" for the jury.

{¶ 60} As stated above, Home Town Realty asserted that Auer failed to present evidence of the actual value of the properties when the transactions occurred. During the trial in March 2012, Auer was asked about the current value of the properties, and she testified that the properties were worthless. She indicated that the Belton Street house had burned down, and that the City of Dayton was planning to tear down the Richmond Avenue buildings. Home Town Realty focuses on this specific testimony to argue that there was no evidence of the value of the properties at the time of the transactions.

{¶ 61} Upon review of the evidence, we find that Auer presented sufficient evidence of the actual value of the Richmond properties at the time of the sales to allow the issue of damages for those properties to go to the jury. According to the evidence at trial,

on November 5, 2007, Kermali Holdings, LLC purchased 1111 Richmond Avenue for $25,000 and 1115 Richmond Avenue for $24,195. Paliath was the agent for Kermali Holdings in the transactions. On November 16, 2007, Auer's company, Rapid Realty Solutions, contracted to purchase 1111 and 1115 Richmond Avenue for $40,000 each, based in part on Paliath's representations to Auer that Paliath had a list of people waiting to rent units, that the property could be rehabilitated by January 2008, and that the properties could quickly be sold for $90,000 each. On December 6, 2007, Auer obtained appraisals for 1111 and 1115 Richmond Avenue from Tina Hoffacker of First Priority Appraisals, LLC, who was a friend of Paliath. The appraisals valued the properties at approximately $90,000. Auer's purchases of 1111 and 1115 Richmond Avenue closed on December 14, 2007; Paliath acted as a dual agent for Auer and Kermali Holdings. Auer testified that when she later attempted to refinance the properties based on the appraisals, the bank "laughed at my appraisals," said that the properties were not worth what Auer had paid, and would not lend her money for the properties. (Tr. 217, 276) Darrin Carey informed Auer in October 2008 that it would take at least $40,000 per building to render them habitable. (Tr. 235.)

{¶ 62} The jury awarded $68,800 in damages related to the purchases of 1111 and 1115 Richmond Avenue. The evidence regarding the purchase price for the properties in November 2007, when they were bought by Kermali Holdings, supplied a basis for determining the properties' actual value. The jury could have also reasonably considered the information regarding the property provided in the appraisals and the cost of needed repairs to determine the actual value in 2007. The trial court properly denied Home Town Realty's motion for a directed verdict as to 1111 and 1115 Richmond Avenue.

{¶ 63} Auer purchased 1119 Richmond Avenue for $60,000 on December 19, 2007. Before purchasing the property, Paliath told Auer that the building had been rehabbed and that it was fully rented; Paliath indicated that the property was worth $90,000, but Auer could buy it for $60,000. Paliath admitted at trial that, a few weeks before she sold the property to Auer, she had purchased the property for between $8,000 and $9,000; Paliath did not dispute Auer's counsel's representation that the purchase price was approximately $8,500. Paliath testified that she did "a lot of work to that property" prior to the sale to Auer, but the jury was not required to credit that testimony. This evidence was sufficient proof of damages regarding 1119 Richmond Avenue. Indeed, the difference between the amount paid by Paliath and the sale price paid by Auer appears to have formed the basis for the jury's award of $51,400. The trial court did not err in denying Home Town Realty's motion for a directed verdict regarding this property.

{¶ 64} We cannot conclude, however, that Auer presented sufficient evidence of damages with regard to 117 Belton Street. Auer purchased 117 Belton Street for $20,000 on October 5, 2007. Prior to the purchase, Paliath represented to Auer that the property was "rent ready" and that it would produce $400 per month; the Belton property was rented at the time of closing. Paliath also told Auer that "Harvard was worth eighty and Belton was worth forty, if [Auer] bought them both then [she] could have them for half of what they were worth so that they, [Auer] knew they would cash flow." (Tr. 373.) Auer testified that she believed Paliath's representation that the properties were worth twice the price she paid. (Tr. 372.) Auer stated, "That's the only reason I would have purchased them." (Tr. 373.)

{¶ 65} Auer presented substantial evidence that Paliath's representations about the

Belton property were untrue. When Judith Lancester went into 117 Belton in the spring of 2008, the front door would not close properly, and there was a hole in the back of the house where squirrels had eaten into the bathroom. Lancaster stated that, although there was a tenant, the property was not "rent ready." Auer, Lancaster, and Carey also testified to the condition of the Belton property as of October 2008. Their testimony indicated that, at that time, the kitchen was not rent ready, the basement had broken pipes, dirt on the floor, and moldy walls, and the back wall had been damaged. (Tr. 213-14, 476)

{¶ 66} While a jury may have reasonably concluded that Paliath misrepresented the condition of the Belton property and the income it could produce, Auer did not provide any evidence as to the actual value of the property in October 2007, when Auer purchased it. Nor was there any evidence of the cost of the repairs that were needed in order to render the property "rent ready;" such evidence might have provided a basis for the jury to determine the actual value of the property. The fact that Belton subsequently burned and is no longer standing does not support a conclusion that the residence had no or little value in October 2007. The trial court therefore erred in denying Home Town Realty's motion for a directed verdict due to lack of evidence of the actual value of the Belton property at the time of Auer's purchase.

{¶ 67} The first assignment of error is sustained as to the Belton Street property and overruled as to the Richmond Avenue properties.

IV.

{¶ 68} In light of our disposition of the first assignment of error, the trial court's judgment of $15,000 in favor of Auer and against Home Town Realty with respect to the

Belton Street property will be vacated.   In all other respects, the trial court's judgment will be affirmed.

. . . . . . . . . .

FAIN, P.J. and DONOVAN, J., concur.

Copies mailed to:

Laurence A. Lasky
Thomas H. Pyper
P. Christian Nordstrom
John H. Burtch
Robert J. Tucker
Jamie A. Paliath
Hon. Barbara P. Gorman

Case Name:         *Torri Auer, et al. v. Jamie Paliath, et al.*
Case No.:          Montgomery App. No. 25158
Panel:        Fain, Donovan, Froelich
Author:        Jeffrey E. Froelich
Summary: